THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUFFETS, LLC, *et al.*[1] | § | Case No. 16-50557-RBK |
| | § | |
| Debtors. | § | (Joint Administration Pending) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING A PROCEDURE FOR DETERMINING CLAIMS ARISING UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT; (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN PRE-PETITION CLAIMS ARISING UNDER THE PERISHABLE AGRICULTURE COMMODITIES ACT, AND (III) GRANTING RELATED RELIEF**

Buffets, LLC, *et al.* (collectively, the "Debtors"), debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), by and through undersigned counsel, hereby files this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) establishing a procedure for determining claims arising under the Perishable Agricultural Commodities Act of 1930 (as amended, modified, or supplemented from time to time, "PACA"), and any and all state statutes of similar effect, (ii) authorizing, but not directing, the Debtor, in its sole discretion, to pay, in the ordinary course of business all claims of PACA Vendors (as defined herein, whose claims shall be identified herein collectively as the "PACA Claims"); and (iii) granting related relief. In support of this Motion, the Debtor submits the *Declaration of Peter Donbavand in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is being filed contemporaneously herewith and are incorporated herein by reference. In further support of this Motion, the Debtor respectfully states as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Buffets, LLC (2294); Hometown Buffet, Inc. (3002); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); and Tahoe Joe's Inc. (7129). The address for all of the Debtors is 120 Chula Vista Drive, Hollywood Park, Texas 78232.

{37671085;4}

## JURISDICTION

1. The United States Bankruptcy Court for the Western District of Texas (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are Bankruptcy Code sections 105(a), 363, 503(b), 507(a)(2), 1107(a) and 1108, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage its property as a debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Case.

5. The Debtors are some of the largest operators of buffet-style restaurants in the United States with approximately 150 stores operating in more than 25 states. The Debtors' concepts include five buffet restaurant chains and a full service steakhouse. The Debtors' buffet restaurants principally operate under the names Old Country Buffet®, Country Buffet®, HomeTown® Buffet, Ryan's® and Fire Mountain®. These locations primarily offer self-service buffets with entrees, sides, and desserts for an all-inclusive price. In addition, the Debtors own and operate a 10-unit full service, casual dining chain under the name Tahoe Joe's Famous Steakhouse®.

6. On August 19, 2015, Alamo Ovation, LLC acquired Buffets Restaurants Holdings, Inc. (the "Merger"). Under the Merger, Alamo Ovation Acquisition, Inc., an acquisition subsidiary of Alamo Ovation, LLC, merged with and into Buffets Restaurants

Holdings, Inc. with Buffets Restaurants Holdings, Inc. remaining as the surviving corporation. As a result of the Merger, Buffets Restaurants Holdings, Inc. became a wholly owned subsidiary of Alamo Ovation, LLC, a Texas limited liability company.

7. Buffets Restaurants Holdings, Inc., is a holding company that wholly owns Buffets Holdings, LLC f/k/a Buffets Holdings, Inc., a Delaware limited liability company, which in turn wholly owns Buffets, LLC f/k/a Buffets, Inc. ("Buffets"), a Minnesota limited liability company, which both operates restaurants directly and is the sole parent of several other restaurant operating companies in the Debtor group.

8. Buffets is the direct parent of the following Debtors: Hometown Buffet, Inc.; OCB Restaurant Company, LLC; OCB Purchasing Co.; and Ryan's Restaurant Group, LLC (collectively, the "Direct Buffets Subsidiaries"), through which various restaurants and restaurant functions are operated. The other Debtors, Tahoe Joe's, Inc. and Fire Mountain Restaurants, LLC, are indirectly owned by Buffets through one of the Direct Buffets Subsidiaries. The Debtors' corporate headquarters are located in Hollywood Park, Texas.

9. Immediately following the Merger, the Debtors operated over 300 restaurants in 35 states which included the five buffet brands: Ryan's®, HomeTown® Buffet, Old Country Buffet®, Country Buffet®, and Fire® Mountain and the one full service, casual dining brand, Tahoe Joe's® Famous Steakhouse.

10. The Debtors' business operations are, and have been, managed by FMP SA Management Group, LLC ("FMP") pursuant to a management agreement. FMP, a privately held company based in Hollywood Park, Texas, is a multi-concept developer and operator of independent restaurant chains. FMP provides operational oversight and all professional and administrative services for the Debtors. In return for the services provided, FMP receives

{37671085;4}  3

reimbursement of allocated costs and expenses and a management fee. A separate entity, FMP Ovation Payroll, LLC ("FMP Ovation"), provides employment and wage related services for the Debtors.

11. Since the Merger, certain events have occurred that were the genesis for the filing of these Chapter 11 cases. In October 2015, an $11.37 million judgment against Buffets, LLC (formerly known as Buffets, Inc., which was the named defendant although not the entity actually operating the restaurant where the alleged incident occurred) was awarded to plaintiffs in a 2014 court case for an incident dating back to 2010. No answer to such lawsuit was timely filed by prior management, which apparently overlooked it after initially receiving the service of process and such lawsuit was not disclosed by the previous management and ownership group in the course of 2015 negotiations leading to the recent Merger and change of control. Buffets, LLC is also attempting to overturn such judgment on the basis of the wrong defendant entity having been sued and other grounds.

12. Although at the time of the Merger, Buffets Restaurants Holdings, Inc. represented adequate positive cash flow for the operating entities, the financial results since the Merger have been far less than expected. For example, sales were down twenty-two percent (22%) from the seller's projections. This decline in the Debtors' cash flow performance combined with unanticipated expenses has caused a severe liquidity strain. Despite the Debtors' best efforts, the Debtors have fallen behind on their obligations to creditors.

13. As of the Petition Date, Buffets is the primary obligor on several term notes the approximate principal amounts of which total in the aggregate $46,168,000 (the "Loans"). Buffets pledged all of its assets as collateral to secure the Loans. The Loans are guaranteed by each of the Debtors as well as the following non-debtors: Alamo Ovation, LLC,

{37671085;4} 4

Buffet Restaurants Holdings, Inc. and Buffets Holdings, LLC. In addition, the Debtors have unsecured debt in an aggregate amount exceeding $60 million which includes over $18 million in ordinary course trade debt and rent that was unpaid as of the Petition Date.

14. Due to the numerous underperforming restaurants, the Debtors closed and vacated 74 stores several weeks prior to the Petition Date and closed another 92 stores immediately preceding the bankruptcy filing which the Debtors will vacate within the next 7-10 days.

15. As of the Petition Date, the Debtors continue to operate approximately 150 restaurants in over 25 states including Texas, California, Minnesota, Wisconsin, Michigan, Illinois, Colorado, Missouri, New York, New Jersey, Pennsylvania, Maine, Tennessee, Indiana, Washington, Oregon, Delaware, South Carolina, Louisiana, West Virginia, Ohio, Kentucky, North Carolina, Tennessee and Mississippi.

16. The Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues. These efforts have included retaining a Chief Restructuring Officer, Bill Patterson of Bridgepoint Consulting, LLC, for the Debtors with the goal of consensually restructuring the Debtors' restaurant footprint and balance sheet.

17. The Debtors have commenced these cases in order to fully implement their restructuring efforts and to deal with both legacy costs and those liabilities resulting from the store closures. The Debtors believe that once they shed themselves of the burdens associated with the Wyoming litigation and the unprofitable stores, they can focus their efforts on their successful stores which will provide sufficient cash to fund the Debtors' ordinary course expenses and enable the Debtors to become a profitable enterprise.

18. Additional details regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of this Chapter 11 Case are set forth in the First Day Declaration filed contemporaneously herewith and incorporated herein by reference as though set forth in full.

## THE DEBTOR'S PACA OBLIGATIONS

A. The Perishable Agricultural Commodities Act

19. In 1930, Congress enacted PACA to regulate the produce industry and promote fair dealings in transactions involving fruits and vegetables. *See* 7 U.S.C. § 499e(c)(2); 7 C.F.R. § 46.46(b); *see also Golman-Hayden Co. v. Fresh Source Produce Inc.*, 217 F.3d 348, 350 (5th Cir. 2000). Under PACA, the term "perishable agricultural commodity" is generally defined as "fruits and fresh vegetables of every kind and character" "whether or not frozen or packed in ice." 7 U.S.C. § 499a(b)(4). PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust (the "PACA Trust"), consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the product derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets"). *See* 7 U.S.C. § 499e(c)(2); 7 C.F.R. § 46.46(b); *In re Delta Produce, LP,* 521 B.R. 576, 583 (W.D. Tex. 2014) ("PACA established a scheme in which a buyer of produce on credit is required to hold the produce and its derivatives and/or proceeds in trust for the unpaid seller"). Assets subject to a PACA Trust are preserved by statute as a non-segregated floating trust and may be commingled with non-trust assets. *See* 7 U.S.C. § 499e(c)(2). However, courts in this and other circuits have consistently held that PACA Trust Assets are not property of a debtor's estate. *See Ruby Robinson Co., Inc. v. Herr*, 453 Fed.Appx. 463, 465 (5th Cir. 2011) ("Ordinary principles of trust law apply to trusts created under PACA, so that for instance the trust assets are excluded from the estate should the

dealer go bankrupt.") (quoting *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997)).

20. In order for a seller of perishable agricultural commodities to preserve its rights as a PACA Trust beneficiary, PACA requires that such seller take certain procedural steps. Specifically, a PACA Vendor must provide written notice (a "PACA Notice") to the purchaser of such goods of its intent to preserve the benefits of the PACA Trust. *See Bocchi Americas Assocs. Inc. v. Commerce Fresh Mktg. Inc.,* 515 F.3d 383, 389 (5th Cir. 2008). Written notice under PACA may be accomplished by either (a) including the statutorily-mandated language on the face of the vendor's invoices or (b) providing written notice to the purchaser of the PACA goods within thirty (30) days after the time payment is due. Beneficiaries of a PACA Trust that adhere to the statutory notice requirements are entitled to prompt payment from the PACA Trust Assets ahead of secured and unsecured creditors of a debtor's estate. *Id.* at 388. However, a PACA goods seller's failure to comply with the notice requirements renders its claim a general unsecured claim in a debtor's chapter 11 case.

21. PACA's application is limited to sales to commission merchants, brokers, and dealers. 7 U.S.C. § 499e(c). "Dealer", as such term is defined in PACA, is "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce." 7 U.S.C. § 499a(b).

**B.     PACA and this Chapter 11 Case**

22. In the ordinary course of business, the Debtors engage various service providers, goods providers, and other vendors in connection with their operations, the absence of which will threaten the Debtors' ongoing restaurant operations. Without the goods and services provided by certain of these vendors, the Debtors' restaurants and operations as a whole will suffer immediate

{37671085;4}                                                              7

and irreparable harm. To ensure that the Debtors continue to receive a constant supply of fresh fruits and vegetables post-petition, the Debtors seek authority, but not direction, in their sole discretion, to continue to pay PACA Claims to those vendors who supply the Debtors with fruits and vegetables (each a "PACA Vendor", and collectively, the "PACA Vendors") in the ordinary course of business and consistent with their historical practices in effect prior to the Petition Date.

23. The Debtors believe that a certain portion of the goods they purchase from vendors may qualify as "perishable agricultural commodit[ies]" under PACA. As a result, provided that the PACA Vendors abide by the notice requirements of PACA, they will be eligible to assert PACA Claims[2] granting them priority ahead of all other secured and unsecured creditors in these Chapter 11 Cases.

24. As of the Petition Date, the Debtors estimate they may owe PACA Vendors as much as $9.875 million in the aggregate for PACA goods delivered prior to the Petition Date. The Debtors expect to be invoiced for substantially all of the amounts owed to PACA Vendors within twenty-one (21) days following the Petition Date.

25. It is essential that the Debtors be able to maintain its business relationships with, and honor outstanding payment obligations to, its PACA Vendors in light of the role that they play in the Debtors continuation of their business. In addition, various third parties who provide goods and services to the Debtors, such as the PACA Vendors, may be able to assert liens

---

[2] Certain of the Debtors' vendors may also be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 et seq. ("PASA"), which prescribes the conditions of operations for businesses dealing in livestock. PASA creates a statutory trust scheme which is virtually identical to PACA in respect of delivery of livestock and other eligible goods. *See In re W.L. Bradley Co.*, 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) ("The Legislative history expressly notes that the PACA Trust was modeled on the trust amendment to the Packers and Stockyards Act."). To the extent that any claims fall under PASA, the Debtors submit that it is in the best interests of the Debtors' estates, creditors and parties-in-interest to treat such claims in a manner identical to the claims of the PACA Vendors. Accordingly, for the purposes of the Motion and any related orders, any claims arising under PACA shall also incorporate any claims arising under PASA.

against the Debtors' assets. It is critical to the Debtors' business operations that the Debtors continue to receive without disruption goods and services from the PACA Vendors. The Debtors believe that without the relief requested herein, many of these vendors will cease delivering goods and providing services to the Debtors. Any such disruption would have a devastating effect on the Debtor's operations and its reorganization efforts.

26. Accordingly, payment of PACA Claims at the outset of these Chapter 11 Cases will not prejudice or affect the amount available for distribution to other creditors of the Debtors. To ensure the continued, uninterrupted supply of fresh produce, it is important that the Debtors be authorized to pay all valid PACA Claims in the ordinary course of business and consistent with their historical practices.

## RELIEF REQUESTED

27. The Debtors respectfully request entry of an Order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a), 363(b), 503, and 507 of the Bankruptcy Code establishing a procedure for determining PACA claims and authorizing, but not directing, the Debtors, in their sole discretion, to pay the PACA Claims and granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate. This relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## BASIS FOR RELIEF

**A.     Payment of The PACA Claims is Necessary**

28. Courts generally acknowledge that it is appropriate to authorize the payment of pre-petition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *In re Mirant Corp., et al.,* 296 B.R. 427, 429-30 (Bankr. N.D. Tex. 2003) (authorizing Chapter 11 debtors payment of pre-bankruptcy wages,

salaries, medical benefits, and business expense claims necessary to avoid to avoid risk that Chapter 11 debtors' business of generating and selling electric power might otherwise be interrupted); *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (The Court may issue any order "necessary or appropriate" to allow a debtor-in-possession to fulfill its duty to preserve the business' going-concern value, including an order authorizing payment in full or in part of certain prepetition claims of unsecured creditors prior to confirmation of a plan); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (While pre-petition claims are normally disposed of in a plan of reorganization and in accordance with statutory priorities, there are well-established "necessity of payment" and similar exceptions.) When authorizing payments of certain pre-petition obligations, courts have relied upon several legal theories rooted in sections 363(b) and 105(a) of the Bankruptcy Code.

29. A debtor-in-possession, like a trustee, is a fiduciary holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners. See 7 COLLIER ON BANKRUPTCY ¶ 1106.02[3] (15th ed. rev. 2001); *Dodson v. Huff (In re Smyth, III)*, 207 F.3d 758, 761 (5th Cir. 2000); *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir. 1977). Implicit in the duties of a Chapter 11 trustee or a debtor-in-possession as set out in Sections 1106 and 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going-concern value. *See In re CoServ, L.L.C.*, 273 B.R. at 497.

30. Consistent with such fiduciary duties, courts have authorized payment of pre-petition obligations under section 363(b) where a sound business purpose exists for doing so. *In re Kmart Corp.,* 359 F.3d 866 (7th Cir. 2004). Most noting that section 363(b) must be read "broadly" with enough flexibility to authorize a debtor to honor pre-petition claims where

{37671085;4} 10

supported by an appropriate business justification. *Id.* at 872. Courts have also authorized payment of pre-petition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code, which empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Under this section, courts may authorize pre-plan payment of pre-petition obligations when essential to the continued operation of a debtor's business and, in particular, where nonpayment of a pre-petition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re CoServ*, 273 B.R. at 497 (finding that section 105 empowers bankruptcy courts to authorize payment of pre-petition debt when such payment is necessary to facilitate the rehabilitation of the debtor). Indeed, courts have recognized that there are occasions when the debtor's fiduciary duty to protect and preserve the estate, including an operating business's going-concern value, "can *only* be fulfilled by the preplan satisfaction of a prepetition claim." *Id.* (emphasis added).

31. Indeed, courts in the Fifth Circuit have recognized the "necessity of payment" doctrine. The court in *In re Gulf Air, Inc.*, 112 B.R. 152, 20 (Bankr. W.D. La. 1989), applied the "necessity of payment" doctrine to an airline reorganization's request to compensate employees for prepetition services rendered. The court said that it agreed with the movant that, without immediate payment, many of the debtor's skilled employees would abandon their employment and that immediate payment was essential to reorganization efforts. *Id.* The court found and concluded that grant of the debtor's motion in its entirety was in the best interest of creditors, the debtor, and its employees, and was "necessary," in fact, indispensable at the present time for any successful reorganization. *Id.*; *See also In re CoServ*, 273 B.R. at 496-97 (the bankruptcy court determined that the debtor-in-possession's role as the equivalent of a trustee under § 1107(a) and

its duty to protect the going concern value of an operating business in a Chapter 11 provided the "bridge that makes application to the Doctrine of Necessity `necessary or appropriate to carry out the provisions of the Bankruptcy Code.'") (quoting 11 U.S.C. § 105(a)).

32. The necessity of payment doctrine is designed to foster the rehabilitation of a debtor in reorganization cases, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 176 (Bankr. S.D. N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed ... where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to II U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

33. In these cases, the Debtors' operations require the seamless coordination of a multitude of unrelated third-parties at every stage in the supply chain. Collectively, the Debtors' supply chain ensures that the Debtors receive all of the food, products, and supplies necessary to operate their business and provide their customers with the high-quality food expected under the Debtors' brands. Any significant disruption in the Debtors' supply chain, such as a vendor halting delivery of certain necessary goods and/or services, could result in the Debtors not having sufficient food, products and supplies to operate their business. Given the highly-competitive nature of the restaurant business, such a result could be detrimental to the Debtors' business and significantly impair their restructuring efforts.

34. The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estate, and will benefit the Debtors' estate and their creditors by allowing the Debtors'

business operations to continue without interruption. Specifically, the authority, but not direction, to satisfy the PACA Claims in the initial days of these Chapter 11 Cases without disrupting the Debtors' business operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtor is willing and able to conduct business as usual during these Chapter 11 Cases.

B. **Payment of Allowed PACA Claims in the Ordinary Course of Business is Warranted**

35. The Court should authorize the prompt and full payment of the PACA Claims. Courts in this and other districts routinely grant similar relief with respect to the treatment of PACA Claims. *See, e.g., In re Delta Produce, et al.,* No. 12-50073 (CAG) (Bankr. W.D. Tex. Jan. 25, 2012) Docket No. 52; *In re Superior Tomato-Avocado, Ltd.,* No. 12–50074 (CAG) (Bankr. W.D. Tex. Feb. 1, 2012) Docket No. 31; *In re Amicus Wind Down Corp. (f/k/a Friendly Ice Cream Corp.)*, No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011), Docket No. 57; *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2010), Docket No. 500; *In re Dixie Produce & Packaging, L.L.C.*, No. 05–13410 (JAB) (Bankr. E.D. La. Oct. 27, 2005) Docket No. 177.

36. As discussed above, assets governed by PACA do not constitute property of the Debtors' estates. *See Ruby Robinson Co., Inc. v. Herr*, 453 Fed.Appx. 463, 465 (5th Cir. 2011). ("Ordinary principles of trust law apply to trusts created under PACA, so that for instance the trust assets are excluded from the estate should the dealer go bankrupt.") (quoting *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997)). As a result, the distribution of assets to PACA Vendors falls outside the Bankruptcy Code's priority scheme, and such claimants are entitled to payment from the PACA Trust ahead of the Debtors' other creditors. *In re Fresh Approach, Inc.,* 51 BR 412, 419 (Bankr. N.D. Tex. 1985). Accordingly, the relief requested

herein with respect to the payment of the PACA Claims does not prejudice the Debtors' creditors or any party-in-interest in these Chapter 11 Cases.

37. Furthermore, payment of allowed PACA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and their PACA Vendors. Any delays in satisfying amounts owed to PACA Vendors could adversely affect the Debtors' ability to obtain fresh produce, thereby undercutting the Debtors' reorganization prospects. Failing to pay allowed PACA Claims in the ordinary course of business could subject the Debtors to numerous claims and adversary proceedings, including motions by PACA Vendors for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort and money by the Debtors.

38. Lastly, in certain circumstances, officers, or directors, or members of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA. *See Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280,282-283 (9th Cir. 1997); *see also Golman-Hayden Co., v. Fresh Source Produce Inc.*, 217 F.3d 348, 350 (5th Cir. 2000) (court will require (a) whether the individual's involvement with the corporation was sufficient to establish legal responsibility and (b) whether the individual, in failing to exercise any appreciable oversight of the corporation's management, breached a fiduciary duty owed to PACA creditors, to determine personal liability). Thus, to the extent that any valid obligations arising under PACA remain unsatisfied by the Debtors, the Debtors' officers or members may be subject to lawsuits during the pendency of these Chapter 11 Cases. Any such lawsuit (and ensuing potential liability) would distract the Debtors and their officers or members in its efforts to implement a successful reorganization strategy and, moreover, could

lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements and applicable laws to the detriment of the Debtor.

### C.  Paying the PACA Claims Will Not Affect Creditor Recoveries

39.  The relief requested herein will not affect the recovery of creditors in these Chapter 11 Cases. As stated above, assets governed by PACA do not constitute property of the Debtors' estates. Holders of PACA Claims are entitled to payment from the PACA Trust ahead of the Debtors' other creditors. The Debtors' requested relief affects only the timing of the payment of the PACA Claims, and will not prejudice the recovery of other creditors. In such instances, timely and immediate payment now only provides the PACA Vendors with what they would be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these Chapter 11 Cases. Accordingly, payment to such claimants at the outset of these Chapter 11 Cases will not affect recoveries to other creditors under any chapter 11 plan, and instead, solely impacts the timing of these payments.

### D.  Proposed Procedure for Determining PACA Claims

40.  The Debtors' accounts payable system does not segregate invoices for product that might qualify for PACA protections. Accordingly, the Debtors request a procedure that requires all PACA Vendors to submit to the Debtors, in writing, a request for payment and invoices and/or supporting detail acceptable to the Debtors that will enable the Debtor to determine whether, and in what amount, the claim qualifies as a PACA Claim. PACA Claims should be submitted to Bill Patterson, Chief Restructuring Officer at 120 Chula Vista Dr., San Antonio, Texas 78232. The Debtors anticipate establishing a bar date expressly for PACA Claims, but is not seeking that relief at this time. The Debtors shall file with the Court, the United States Trustee and any statutory committee and accounting of all PACA Claims paid. Upon motion of any party-in-interest filed written thirty (30) days of such accounting, the Debtors (and creditor

paid) shall be required to show cause as to only the payment was properly authorized. If the Court determines the payment was not properly authorized, the PACA Claimant shall immediately repay to the Debtors any payments authorized to the extent such exceed any amount owed by the Debtors post-petition to such creditor, and the balance of the unauthorized payment shall be applied to reduce the outstanding post-petition debt owed to such creditor.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

41. For a debtor to obtain relief to make pre-plan payments within 21 days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid "immediate and irreparable harm." FED. R. BANKR. P. 6003. If a debtor's prospect of reorganizing is threatened, or swift diminution in value of the debtor's estate is likely, absent the granting of the requested relief, immediate and irreparable harm likely exists. *See In re WorldSpace, Inc.*, No. 08–12412 (PJW), 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (granting emergency motions for post-petition financing, adequate protection and modification of the stay where the court found that the relief was necessary to avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operations of the Debtor's business); *In re New World Pasta Co.*, No. 04-02817 (MDF), 2004 WL 5651052, at *5 (Bankr. M.D. Pa. July 9, 2004) (same); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (finding that "immediate and irreparable harm" exists where loss of the business threatens the ability to reorganize).

42. As discussed above, the continuity and viability of the Debtors' business operations depends heavily on the uninterrupted delivery of essential food, products and supplies. The failure of any vendor to deliver essential food, products or supplies or to render services to the Debtors would have immediate and detrimental consequences to the Debtors'

business and would decrease value to the detriment and prejudice to the Debtors. The Debtors cannot risk even the perception that their restaurants will offer anything but the highest level of food and beverage quality and quantity for the duration of these Chapter 11 Cases. Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the PACA Vendors is critical to their continued operations and greatly increases the likelihood of a successful reorganization. Accordingly, the Debtors respectfully submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003 is satisfied.

### SATISFACTION OF BANKRUPTCY RULE 6004(a) AND 6004(h)

43. For the reasons described above, the immediate payment of the PACA Claims is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, given the nature of the relief requested herein, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that either applies.

### NOTICE

44. The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtor; (c) the United States Attorney's Office for the Western District of Texas; (d) the Internal Revenue Service; (e) any known PACA Vendors; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered with respect to this Motion as required by the Local Rules governing procedures in complex Chapter 11 cases. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as may be just, proper and equitable.

Dated: March 7, 2016

        Respectfully submitted,

        AKERMAN LLP

          /s/ David W. Parham
        David W. Parham, SBN: 15459500
        John E. Mitchell, SBN: 00797095
        2001 Ross Avenue, Suite 2550
        Dallas, TX 75201
        Telephone: (214) 720-4300
        Facsimile: (214) 981-9339
        david.parham@akerman.com
        john.mitchell@akerman.com

        and

        Andrea Hartley (*Pro Hac Vice* Pending)
        Florida Bar No. 864234
        Esther A. McKean (*Pro Hac Vice* Pending)
        Florida Bar No. 28124
        Amy M. Leitch (*Pro Hac Vice* Pending)
        Florida Bar No. 90112
        Three Brickell City Centre
        98 Southeast Seventh Street
        Miami, FL 33131
        Telephone: (305) 374-5600
        Facsimile: (305) 374-5095
        andrea.hartley@akerman.com
        esther.mckean@akerman.com
        amy.leitch@akerman.com

        PROPOSED COUNSEL FOR DEBTORS
        AND DEBTORS-IN-POSSESSION