IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUFFETS, LLC, *et al.*[1] | § | Case No. 16-50557-RBK |
| | § | |
| Debtors. | § | (Joint Administration Pending) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO (A) MAINTAIN EXISTING INSURANCE PROGRAMS AND EXISTING INSURANCE PREMIUM FINANCING AGREEMENT, AND (B) FUND ALL OBLIGATIONS IN RESPECT THEREOF, AND (II) GRANTING RELATED RELIEF**

Buffets, LLC and the affiliated debtors and debtors-in-possession listed above (the "Debtors") in the above-captioned Chapter 11 case (the "Chapter 11 Case"), by and through their undersigned counsel, hereby files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a), 363(b), and 503(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing, but not directing, the Debtors to (a) maintain the Debtors' existing insurance programs and premium financing agreement on an uninterrupted basis in accordance with its historical practices and (b) fund all premiums, deductibles, fees, and other obligations in respect thereof, whether relating to the prepetition or post-petition period, and (ii) granting such other and further relief as is requested herein or as the Court (as defined herein) otherwise deems necessary or appropriate. In support of this Motion, the Debtors submit the *Declaration of Peter Donbavand in Support of Chapter 11 Petitions and First Day Motions* (the "First Day

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Buffets, LLC (2294); Hometown Buffet, Inc. (3002); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); and Tahoe Joe's, Inc. (7129). The address for all of the Debtors is 120 Chula Vista Drive, Hollywood Park, Texas 78232.

{37682666;3}

Declaration"), which is being filed contemporaneously herewith and is incorporated herein by reference. In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. The United States Bankruptcy Court for the Western District of Texas (the "Court") has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004.

## BACKGROUND

4. The Debtors are some of the largest operators of buffet-style restaurants in the United States with approximately 150 stores operating in more than 25 states. The Debtors' concepts include five buffet restaurant chains and a full service steakhouse. The Debtors' buffet restaurants principally operate under the names Old Country Buffet®, Country Buffet®, HomeTown® Buffet, Ryan's® and Fire Mountain®. These locations primarily offer self-service buffets with entrees, sides, and desserts for an all-inclusive price. In addition, the Debtors own and operate a 10-unit full service, casual dining chain under the name Tahoe Joe's Famous Steakhouse®.

5. On August 19, 2015, Alamo Ovation, LLC acquired Buffets Restaurants Holdings, Inc. (the "Merger"). Under the Merger, Alamo Ovation Acquisition, Inc., an acquisition subsidiary of Alamo Ovation, LLC, merged with and into Buffets Restaurants Holdings, Inc. with Buffets Restaurants Holdings, Inc. remaining as the surviving corporation. As a result of the Merger, Buffets Restaurants Holdings, Inc. became a wholly owned subsidiary of Alamo Ovation, LLC, a Texas limited liability company.

6. Buffets Restaurants Holdings, Inc., is a holding company that wholly owns Buffets Holdings, LLC f/k/a Buffets Holdings, Inc., a Delaware limited liability company, which in turn wholly owns Buffets, LLC f/k/a Buffets, Inc. ("Buffets"), a Minnesota limited liability company, which both operates restaurants directly and is the sole parent of several other restaurant operating companies in the Debtor group.

7. Buffets is the direct parent of the following Debtors: Hometown Buffet, Inc.; OCB Restaurant Company, LLC; OCB Purchasing Co.; and Ryan's Restaurant Group, LLC (collectively, the "Direct Buffets Subsidiaries"), through which various restaurants and restaurant functions are operated. The other Debtors, Tahoe Joe's, Inc. and Fire Mountain Restaurants, LLC, are indirectly owned by Buffets through one of the Direct Buffets Subsidiaries. The Debtors' corporate headquarters are located in Hollywood Park, Texas.

8. Immediately following the Merger, the Debtors operated over 300 restaurants in 35 states which included the five buffet brands: Ryan's®, HomeTown® Buffet, Old Country Buffet®, Country Buffet®, and Fire® Mountain and the one full service, casual dining brand, Tahoe Joe's® Famous Steakhouse.

9. The Debtors' business operations are, and have been, managed by FMP SA Management Group, LLC ("FMP") pursuant to a management agreement. FMP, a privately held company based in Hollywood Park, Texas, is a multi-concept developer and operator of independent restaurant chains. FMP provides operational oversight and all professional and administrative services for the Debtors. In return for the services provided, FMP receives reimbursement of allocated costs and expenses and a management fee. A separate entity, FMP Ovation Payroll, LLC ("FMP Ovation"), provides employment and wage related services for the Debtors.

10. Since the Merger, certain events have occurred that were the genesis for the filing of these Chapter 11 cases. In October 2015, an $11.37 million judgment against Buffets, LLC (formerly known as Buffets, Inc., which was the named defendant although not the entity actually operating the restaurant where the alleged incident occurred) was awarded to plaintiffs in a 2014 court case for an incident dating back to 2010. No answer to such lawsuit was timely filed by prior management, which apparently overlooked it after initially receiving the service of process and such lawsuit was not disclosed by the previous management and ownership group in the course of 2015 negotiations leading to the recent Merger and change of control. Buffets, LLC is also attempting to overturn such judgment on the basis of the wrong defendant entity having been sued and other grounds.

11. Although at the time of the Merger, Buffets Restaurants Holdings, Inc. represented adequate positive cash flow for the operating entities, the financial results since the Merger have been far less than expected. For example, sales were down twenty-two percent (22%) from the seller's projections. This decline in the Debtors' cash flow performance combined with unanticipated expenses has caused a severe liquidity strain. Despite the Debtors' best efforts, the Debtors have fallen behind on their obligations to creditors.

12. As of the Petition Date, Buffets is the primary obligor on several term notes the approximate principal amounts of which total in the aggregate $46,168,000 (the "Loans"). Buffets pledged all of its assets as collateral to secure the Loans. The Loans are guaranteed by each of the Debtors as well as the following non-debtors: Alamo Ovation, LLC, Buffet Restaurants Holdings, Inc. and Buffets Holdings, LLC. In addition, the Debtors have unsecured debt in an aggregate amount exceeding $60 million which includes over $18 million in ordinary course trade debt and rent that was unpaid as of the Petition Date.

13. Due to the numerous underperforming restaurants, the Debtors closed and vacated 74 stores several weeks prior to the Petition Date and closed another 92 stores immediately preceding the bankruptcy filing which the Debtors will vacate within the next 7-10 days.

14. As of the Petition Date, the Debtors continue to operate approximately 150 restaurants in over 25 states including Texas, California, Minnesota, Wisconsin, Michigan, Illinois, Colorado, Missouri, New York, New Jersey, Pennsylvania, Maine, Tennessee, Indiana, Washington, Oregon, Delaware, South Carolina, Louisiana, West Virginia, Ohio, Kentucky, North Carolina, Tennessee and Mississippi.

15. The Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues. These efforts have included retaining a Chief Restructuring Officer, Bill Patterson of Bridgepoint Consulting, LLC, for the Debtors with the goal of consensually restructuring the Debtors' restaurant footprint and balance sheet.

16. The Debtors have commenced these cases in order to fully implement their restructuring efforts and to deal with both legacy costs and those liabilities resulting from the store closures. The Debtors believe that once they shed themselves of the burdens associated with the Wyoming litigation and the unprofitable stores, they can focus their efforts on their successful stores which will provide sufficient cash to fund the Debtors' ordinary course expenses and enable the Debtors to become a profitable enterprise.

17. Additional details regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of this Chapter 11 Case are set forth in the First Day Declaration filed contemporaneously herewith and incorporated herein by reference as though set forth in full.

## INSURANCE PROGRAMS AND RELATED OBLIGATIONS

18. In connection with the operation of the Debtors' business, the Debtors maintain comprehensive insurance programs (collectively, the "Insurance Programs") that include a variety of policies through several different insurance carriers (collectively, the "Insurance Carriers"). A detailed list of the Insurance Programs is annexed hereto as **Exhibit B**.[2] The Insurance Programs name the Debtors' parent, Buffets Restaurant Holdings, Inc. ("BRHI") as the primary named insured and the Debtors as named insureds.

19. The premiums with respect to the Insurance Programs are financed pursuant to a premium financing agreement between Bank Direct Capital Finance and Buffets Holdings, LLC ("BH"), a true and correct copy of which is attached hereto as **Exhibit C**.

**A.  Insurance Programs**

20. The Insurance Programs protect the Debtors and their personnel against various risks that may arise in the course of the Debtors' business.

21. In order to protect the Debtors against such risks, the Insurance Programs include the following types of coverage:

> (a)  General Liability and Property Policies. These policies, including related excess policies, provide coverage for claims relating to, among other things, slip and falls and other accidents by customers while patronizing the Debtors' restaurants, sickness caused by food served, damage to property used by the Debtors in their restaurant operations.
>
> (b)  Workers Compensation Policies. These policies, including related excess policies, provide coverage for injuries suffered by the Debtors' employees in the course of their employment.
>
> (c)  Management Liability Policy. These policies, including related excess liability policies, covers the Debtors, directors, officers, managers and

---

[2] Insurance programs as used in this Motion is intended to include all of the Debtors' insurance policies and programs whether listed on Exhibit B or not. While the Debtors believe Exhibit B is all inclusive, given the number of states in which the Debtors operate and the multitude of policies, it is possible that one or more policies were inadvertently omitted from Exhibit B.

business entities from claims arising out of their governance, finance, benefits, employment and management activities on behalf of the Debtors.

(d) <u>Auto Liability Policy.</u> These policies, including related excess liability policies, maintains business auto liability policy on the Debtors' behalf which provide automobile coverage for vehicles used in Debtors' business, including for off-site deliveries and catering.

(e) <u>Crime and Flood.</u> These policies protect the Debtors against losses caused by crime against the Debtors or floods.

22. The Debtors seek from the Court authorization, but not direction, to maintain the Insurance Programs on an uninterrupted basis in accordance with their historical practices.

**B.    Insurance Obligations**

23. The Debtors have indirectly incurred and continue to incur certain obligations relating to the Insurance Programs (such obligations, including those which accrued prior to the Petition Date, the "<u>Insurance Obligations</u>").  Absent payments by the Debtors for the purpose of funding the Insurance Obligations, the Insurance Programs and the Premium Financing Agreement will not be funded and the Debtors' coverage under the Insurance Programs can be voided.  Disruption of the Debtors' insurance coverage will expose the Debtors to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs, (c) losing good-standing certification to conduct business inasmuch as the jurisdiction in which they operate requires the Debtors to maintain certain levels of insurance coverage, (d) being unable to obtain similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

24. The different categories of Insurance Obligations include (a) fixed-rate premiums based on a rate established by each Insurance Carrier, which are generally payable on an annual

basis, but which are financed through the Premium Financing Agreement, (b) deductibles and other fees related to the Insurance Programs, including a self-insured retention with respect to worker's compensation policies all or a portion of which the Debtors fund out of cash flow in the ordinary course of business, (c) payments to insurance agents and brokers who assist with the procurement and negotiation of the Insurance Programs, which payments are generally financed through the Premium Financing Agreement, (d) a claims administrator who manages worker's compensation and general litigation claims, and (e) monthly payments in the amount of $197,074.58, which the Debtors make pursuant to the Premium Financing Agreement. The Debtors also funded $750,000 toward the down payment on the Premium Financing Agreement.

25. In the aggregate, for the 12 month period beginning July 7, 2015, the Debtors will or have paid in the aggregate approximately $2.5 million to facilitate the payment of Insurance Obligations.

26. Accordingly, the Debtors seek this Court's authorization, but not direction, to pay any such outstanding amounts and other amounts as may come due in order to maintain their insurance coverage.

## RELIEF REQUESTED

27. By this Motion, the Debtors respectfully request the entry of an Order substantially in the form annexed hereto as Exhibit A, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (a) authorizing, but not directing, the Debtors to (i) maintain the Insurance Programs and the Premium Financing Agreement on an uninterrupted basis in accordance with its historical practices, (ii) fund all Insurance Obligations, and (b) granting such other and further relief as is requested herein or as the Court otherwise deems necessary or appropriate.

**BASIS FOR RELIEF**

A.  **Ample Authority Exists to Continue to Maintain Insurance Coverage**

28. The Debtors submit that appropriate circumstances exist to justify the continuation of the Insurance Programs in the ordinary course of business, as contemplated by this Motion. The relief requested in this Motion will help minimize any disruption in the Debtors' business operations during the period between the Petition Date and confirmation of a Chapter 11 plan, as well as after its emergence from Chapter 11, thereby preserving the value of the Debtors' estates. Moreover, this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

(a) **Bankruptcy Code Sections 1107(a) and 1108**

29. The Debtors, operating their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108, is a fiduciary "holding the bankruptcy estates and operating the businesses for the benefit of their creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

30. Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.*; *see also In re Mirant Corp.*, 296 B.R. 427, 429-30 (Bankr. N.D. Tex 2003) (allowing debtors to pay claims "reasonably believe[d]" to be authorized under the *CoServ* test or whose payment was necessary "in the exercise of their business judgment … in order for [the d]ebtors to continue their respective businesses"). The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment

was to "sole suppliers of a given product." *CoServ,* 274 B.R. at 498.[3] Payment of the prepetition amounts associated with the Insurance Programs meets each element of the *CoServ* court's standard. Insurance coverage is required by the United States Trustee's Guidelines. Moreover, as a fiduciary for the bankruptcy estates, the Debtors would be violating their duties if they in any way jeopardizes the coverage provided under the Insurance Programs.

      **(b)**     **The Doctrine of Necessity and Bankruptcy Code Section 105**

      31.     Additionally, the Court may authorize the continuation of the Insurance Programs and the payment of the Insurance Obligations pursuant to its equitable powers, either under section 105(a) of the Bankruptcy Code or through the "doctrine of necessity" or the "necessity of payment" doctrine, which allow a bankruptcy court to exercise its equitable power, allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code, and further support the relief requested herein. *Lehigh & New England Ry. Co.*, 657 F.2d at 581 (noting that in order to justify payment under "doctrine of necessity," such payment must be essential to continued operation of debtor). Section 105(a) of the Bankruptcy Code further empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may permit payments on account of prepetition obligations outside the context of a Chapter 11 plan when such obligations are essential to the continued operation of a debtor's business. *See, e.g.*, *In re Just For Feet, Inc.*, 242 B.R. 821, 824 (Bankr. D. Del. 1999) (acknowledging that "[c]ertain pre-petition claims . . . may need to be paid to facilitate a

---

[3] The court in *CoServe* provided a three pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty: (i) First, it must be critical that the debtor deal with the claimant. (2) Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. (3) Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim. *Id*.

successful reorganization" and that "[s]ection 105(a) of the [Bankruptcy] Code provides a statutory basis for the payment of pre-petition claims"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (explaining that doctrine of necessity is standard in Third Circuit for enabling court to authorize payment of prepetition claims prior to confirmation of reorganization plan); *In re Boston & Maine Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (stating that court has power to authorize payments of claims for goods and services that are necessary to debtor's continued operation as going concern); *In re Ionosphere Clubs*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (stating that section 105(a) of Bankruptcy Code permits payment of prepetition claims where necessary to rehabilitate debtor).

32. As set forth above, the Debtors believe that payment of the various prepetition obligations sought to be paid under this Motion is necessary to ensure the continued functioning of the Insurance Programs, avoid litigation, prevent damage to business reputation, and/or, in certain instances, to avoid running afoul of state laws. Accordingly, such payments are appropriately authorized under the "doctrine of necessity."

    **(c)**     **Bankruptcy Code Section 363(b)**

33. To the extent that payment of any of the prepetition obligations sought to be paid under this Motion would be deemed to constitute a use of property outside the ordinary course of business, a basis for authorizing payment of the prepetition amounts associated with the Insurance Programs is found under Bankruptcy Code section 363(b)(1). Bankruptcy Code section 363(b)(1) permits a debtor in possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Courts in this and other circuits have indicated that the use of property of the estate outside of the ordinary course of business is proper where the debtor in possession has articulated a good business reason for

such use. *See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction"); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) (applying Continental to require "articulated business justification" for section 363 transaction); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("[A] § 363 application requires a showing that there is a 'good business reason to grant such an application.'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

34. Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction.[4] *Lange v. Schropp (In re Brook Valley VII, Joint Venture)*, 496 F.3d 892, 900 (8th Cir. 2007) ("In general, courts do not second-guess business decisions made in good faith."); *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

---

[4] The business judgment rule has vitality in chapter 11 cases. See *Lange*, 496 F.3d at 900; *Integrated Res.*, 147 B.R. at 656; *see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").

35. The relief requested in this Motion is necessary for the Debtors to continue their operations during the pendency of the Chapter 11 Case. If the Insurance Programs lapse, the Debtors will be required to obtain replacement insurance, likely at a cost greater than the cost of the current Insurance Programs. Furthermore, replacing the Insurance Programs would divert the time and resources of the Debtors' officers and/or managers away from the restructuring process. Thus, the Debtors submit that they have articulated sound business reasons for the prepetition payments sought hereunder.

36. Courts in this and other districts have granted relief similar to the relief requested herein. *See, e.g.*, *In re: Advanced Living Technologies, Inc.,* No. 13-10313 (HCM) (Bankr. W.D. Tex. March 7, 2013) Docket 72 (authorizing debtors to pay prepetition insurance premiums under Bankruptcy Code sections 105(a), 362, 363, 1107 and 1108 and Bankruptcy Rule 6003); *In re Idearc Inc. f/k/a Verizon Directories Disposition Corporation.*, No. 09-31828 (BJH) (Bankr. N.D. Tex. April 5, 2009) Docket 69 (same); *In re Express Energy Services Operating, LP et al.*, No. 09-38044 (JB) (Bankr. S.D. Tex. October 29, 2009) Docket 43 (authorizing debtors to pay prepetition insurance premiums under Bankruptcy Code sections 105(a), 362, 363, and 503 and Bankruptcy Rule 6003 and 6004).

37. In this case, the continuation of the Insurance Programs and payment of the Insurance Obligations are imperative to the Debtors' continued operations, ability to restructure, and preservation of value of their estates. It is essential for the Debtors to carry insurance in their day-to-day operations, or they run the risk of, among other harms, incurring financial responsibility and legal liability for potential occurrences not covered by insurance. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities.

38. The Debtors need to minimize the risks associated with operating their business. Even a brief delay or suspension in the Debtors' ability to pay the Insurance Obligations could create significant risk that the Debtors would void or otherwise lose the benefits of the Insurance Programs. Disruption of the Debtors' insurance coverage would expose the Debtors to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs, (c) losing good-standing certification to conduct business in jurisdictions requiring the Debtors to maintain certain levels of insurance coverage, (d) being unable to obtain similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

39. Accordingly, the Court should grant the relief requested herein because maintenance of the Insurance Programs and payment of all Insurance Obligations are warranted and are in the best interests of the Debtors' estates, creditors, and all other parties-in-interest.

40. In light of the foregoing, the Debtors respectfully submit that the relief requested herein is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

## **RESERVATION OF RIGHTS**

41. To the extent that any contract or agreement in connection with any of the Insurance Programs is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not at this time intend to assume or reject such contract or agreement. As such, the Court's authorization of payment shall not be deemed to constitute an assumption of such contract or agreement pursuant to section 365 of the Bankruptcy Code. The Debtors are currently in the process of reviewing all of their contracts and agreements and

reserves all of their rights with respect thereto. Nothing herein shall acknowledge, grant, or otherwise permit any right of offset or recoupment by a non-debtor with respect to any claim asserted against the Debtors. If the Court grants the relief sought herein, any payments made pursuant to the Court's order are not intended and should not be construed as an admission to the validity of any claim or a waiver of the rights of the Debtors to dispute such claim subsequently.

42. Additionally, except as expressly stated herein, nothing contained herein is intended or should be construed as (a) an agreement or admission by the Debtors as to the validity of any claim against its estate, (b) a waiver or impairment of the Debtors' right to dispute any claim on any grounds, (c) a promise by the Debtors to pay any claim, or (d) an implication or admission by the Debtors that such claim is payable pursuant to an Order granting the relief requested in this Motion.

## DEBTOR SATISFIES BANKRUPTCY RULE 6003

43. Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding ... a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b). The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

44. To implement successfully the foregoing requested relief, the Debtors respectfully request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise." As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the Debtors' operations, value, and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

45. The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtor; (c) the United States Attorney's Office for the Western District of Texas, San Antonio Division; (d) the Internal Revenue Service; (e) the Debtors' pre-petition secured creditors; (f) each of the Insurance Carriers; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered with respect to this Motion as required by the Local Rules governing complex Chapter 11 cases. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, for the reasons set forth above and in the First Day Declaration, the Debtors respectfully request that the Court enter the Order substantially in the form annexed hereto as **Exhibit A** (i) authorizing, but not directing, the Debtors to (a) maintain the Insurance Programs and the Premium Financing Agreement on an uninterrupted basis in accordance with its historical practices and (b) fund all Insurance Obligations, whether relating to the prepetition or post-petition period, and (ii) granting such other and further relief as is requested herein or as the Court otherwise deems necessary or appropriate.

| | |
|---|---|
| Dated: March 7, 2016 | Respectfully submitted, |

                                                */s/ David W. Parham*
David W. Parham, SBN: 15459500
John E. Mitchell, SBN: 00797095
AKERMAN LLP
2001 Ross Avenue, Suite 2550
Dallas, Texas 75201
Telephone: (214) 720-4300
Facsimile: (214) 981-9339
david.parham@akerman.com
john.mitchell@akerman.com

and

Andrea Hartley (*Pro Hac Vice* Pending)
Florida Bar No. 864234
Esther A. McKean, Esq. (*Pro Hac Vice* Pending)
Florida Bar No. 28124
Amy M. Leitch (*Pro Hac Vice* Pending)
Florida Bar No. 90112
Three Brickell City Centre
98 Southeast Seventh Street
Miami, FL 33131
Telephone: 305.374.5600
Facsimile: 305.374.5095
andrea.hartley@akerman.com
esther.mckean@akerman.com
amy.leitch@akerman.com

PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION