IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUFFETS, LLC, *et al.*[1] | § | Case No. 16-50557-rbk |
| | § | |
| Debtors. | § | (Joint Administration Pending) |

### DECLARATION OF PETER DONBAVAND IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, PETER DONBAVAND, do hereby declare, under penalty of perjury, that:

1.      I am the Vice President for Business Development of Buffets, LLC f/k/a Buffets, Inc. ("Buffets"), a Minnesota limited liability company, with its principal place of business in Hollywood Park, Texas.

2.      I also serve as Vice President for Business Development of each of the above-named debtors.  In my capacity as such, I have detailed knowledge of and experience with the business and financial affairs of Buffets and certain of its affiliates, who are debtors herein, including Buffets' direct and indirect subsidiaries, including Hometown Buffet, Inc., a Minnesota corporation, OCB Restaurant Company, LLC, a Minnesota limited liability company, OCB Purchasing Co., a Minnesota corporation, Ryan's Restaurant Group, LCC, a South Carolina limited liability company, Fire Mountain Restaurants, LLC, an Ohio limited liability company, and Tahoe Joe's, Inc., a Minnesota corporation (each a "Debtor," and collectively, the "Debtors").

3.      As Buffets' Vice President for Business Development, I am one of the officers of the Debtors responsible for devising and implementing the Debtors' business plans and strategies, overseeing the Debtors' financial, operational and legal affairs, and supervising the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Buffets, LLC (2294); Hometown Buffet, Inc. (3002); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); and Tahoe Joe's Inc. (7129).  The address for all of the Debtors is 120 Chula Vista Drive, Hollywood Park, Texas 78232.

maintenance of their books and records. In addition, in my capacity as the Vice President for Business Development of each of the Debtors, I have been involved in the Debtors' restructuring process (the "Restructuring Process"), including, inter alia, (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, reducing or modifying the Debtors' indebtedness, (ii) managing professionals engaged by the Debtors in connection with the Restructuring Process, (iii) supervising the preparation of documentation needed to implement the Restructuring Process, and (iv) consulting on a regular basis with the Debtors' other officers, executives, and members of the Debtors, with respect to the foregoing.

4.      Today (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of their Chapter 11 estates.

5.      The Debtors intend to operate their businesses and to manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

6.      I am advised by counsel that this Court has jurisdiction over these Chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Western District of Texas pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Motions") in order to minimize potential adverse effects of the bankruptcy filings and to maximize the value of their estates.  I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of these Chapter 11 cases and in support of the Debtors' voluntary petitions and First Day Motions.

8.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management teams and other personnel, my knowledge and review of relevant documents including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

9.      I am familiar with the contents of each First Day Motion (including the exhibits) and the facts set forth therein are true and correct to the best of my knowledge.  The relief sought in each First Day Motion will provide an orderly transition of the Debtors into these Chapter 11 cases and ultimately permit the Debtors to reorganize.  Further, I believe the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and stakeholders.

I.      **Overview of the Debtors' Businesses and History**

    A.      **The Debtors' Businesses**

10.      The Debtors are some of the largest operator of buffet-style restaurants in the United States with approximately 150 stores operating in more than 25 states.  The Debtors' concepts include five buffet restaurant chains and a full service steakhouse. The Debtors' buffet restaurants principally operate under the names Old Country Buffet®, Country Buffet®, HomeTown® Buffet, Ryan's® and Fire Mountain®.  These locations primarily offer self-service buffets with entrees, sides, and desserts for an all-inclusive price.  In addition, the Debtors own and operate an 10-unit full service, casual dining chain under the name Tahoe Joe's Famous Steakhouse®.

### B.    The Debtors' Corporate Structure

11.    Alamo Ovation, LLC, a Texas limited liability company, is a holding company that wholly owns Buffets Restaurants Holdings, Inc., a Delaware corporation, which in turn wholly owns Buffets Holdings, LLC f/k/a Buffets Holdings, Inc., a Delaware limited liability company, which in turn wholly owns Buffets, LLC f/k/a Buffets, Inc., a Minnesota limited liability company, which both operates restaurants directly and is the sole parent of several other restaurant operating companies in the Debtor group.

12.    Buffets is the direct parent of the following Debtors: Hometown Buffet, Inc.; OCB Restaurant Company, LLC; OCB Purchasing Co.; and Ryan's Restaurant Group, LLC (collectively, the "Direct Buffets Subsidiaries"), through which various restaurants and restaurant functions are operated.  The other Debtors, Tahoe Joe's, Inc. and Fire Mountain Restaurants, LLC, are indirectly owned by Buffets through one of the Direct Buffets Subsidiaries. The Debtors' corporate headquarters are located in Hollywood Park, Texas.  A chart showing the corporate organization of all of the Debtors and their non-debtor parents is set forth below:



C.    **The Debtors' History**

13.    Buffets, Inc. was founded in 1983 to develop buffet-style restaurants under the name Old Country Buffet®. In October 1985, Buffets, Inc. successfully completed an initial public offering with seven restaurants, and by 1988 had 47 company-owned units and nine franchised units. In September 1996, Buffets, Inc. merged with HomeTown Buffet, a similar publicly-held, buffet-style restaurant company established and developed by one of Buffets, Inc.'s co-founders.  The merger of Buffets, Inc. and HomeTown Buffet added 80 company-owned restaurants in 11 states and 19 franchised restaurants in eight states, bringing the total number of restaurants to 346 company-owned restaurants and 24 franchised restaurants in 36 states as of December 31, 1996.

14.    On October 2, 2000, Buffets Holdings, Inc. acquired Buffets in a buyout from its public shareholders. On November 1, 2006, Buffets, through a wholly-owned subsidiary, merged with Ryan's Restaurant Group, Inc. ("Ryan's") – a similar restaurant concept to Buffets with more than 300 steak-buffet restaurants operating primarily in the Southeastern United States. Under the merger, Buffets' wholly-owned subsidiary merged with and into Ryan's with Ryan's remaining as the surviving corporation. As a result of the Merger, Ryan's became a wholly-owned subsidiary of Buffets.

15.    Due to a variety of external economic factors that adversely affected the companies' operating performance during 2007, Buffets Holdings, Inc. and its direct and indirect subsidiaries filed for Chapter 11 relief in January of 2008 (the "2008 Debtors"). After approximately 16 months in Chapter 11, the 2008 Debtors successfully reorganized and confirmed their Chapter 11 plan on April 17, 2009.  The 2008 Debtors' Chapter 11 plan went effective on April 28, 2009 and their cases have been closed.

16.     The Buffets companies were again impacted by external economic factors of a sluggish U.S. economy including a marked increase in unemployment, higher gasoline and energy costs, lower consumer confidence and associated decline in discretionary spending among the companies' core customers as well as an increase in the minimum wage.  These factors together with above-market rent obligations led to Buffets, its direct parent, the ultimate parent and all direct and indirect subsidiaries filing for Chapter 11 relief in January of 2012 (the "2012 Debtors"). After approximately 5 months in Chapter 11, the 2012 Debtors successfully reorganized and confirmed their Chapter 11 plan on June 27, 2012.  The 2012 Debtors' Chapter 11 plan went effective on July 18, 2012.

17.     Three years later, on August 19, 2015, Alamo Ovation, LLC acquired Buffets Restaurants Holdings, Inc. (the "Merger").  Under the Merger, Alamo Ovation Acquisition, Inc., an acquisition subsidiary of Alamo Ovation, LLC, merged with and into Buffets Restaurants Holdings, Inc. with Buffets Restaurants Holdings, Inc. remaining as the surviving corporation. As a result of the Merger, Buffets Restaurants Holdings, Inc. became a wholly owned subsidiary of Alamo Ovation, LLC, a Texas limited liability company.

18.     Immediately following the Merger, the Debtors operated over 300 restaurants in 35 states which included five buffet brands: Ryan's®, HomeTown® Buffet, Old Country Buffet®, Country Buffet®, and Fire® Mountain and the one full service, casual dining brand, Tahoe Joe's® Famous Steakhouse.

19.     The Debtors' business operations are, and have been, managed by FMP SA Management Group, LLC ("FMP") pursuant to a management agreement.  FMP, a privately held company based in Hollywood Park, Texas, is a multi-concept developer and operator of independent restaurant chains.  FMP provides operational oversight and all professional and

administrative services for the Debtors. In return for the services provided, FMP receives reimbursement of allocated costs and expenses and a management fee. A separate entity, FMP Ovation Payroll, LLC ("FMP Ovation"), provides employment and wage related services for the Debtors.

### D. Debt Structure

20. As of the Petition Date, Buffets is the primary obligor on several term notes the approximate principal amounts of which total in the aggregate $46,168,000 (the "Loans"). Buffets pledged all of its assets as collateral to secure the Loans. The Loans are guaranteed by each of the Debtors as well as the following non-debtors: Alamo Ovation, LLC, Buffets Restaurants Holdings, Inc. and Buffets Holdings, LLC. In addition, the Debtors have unsecured debt in an aggregate amount exceeding $60 million which includes over $18 million in ordinary course trade debt and rent that was unpaid as of the Petition Date.

## II. Events Leading to the Debtors' Bankruptcy Filing

21. Since the Merger, certain events have occurred that were the genesis for the filing of these Chapter 11 cases. In October 2015, an $11.37 million judgment against Buffets, LLC (formerly known as Buffets, Inc., which was the named defendant although not the entity actually operating the restaurant where the alleged incident occurred) was awarded to plaintiffs in a 2014 court case for an incident dating back to 2010. No answer to such lawsuit was timely filed by prior management, which apparently overlooked it after initially receiving the service of process and such lawsuit was not disclosed by the previous management and ownership group in the course of 2015 negotiations leading to the recent Merger and change of control. Buffets, LLC is also attempting to overturn such judgment on the basis of the wrong defendant entity having been sued and other grounds.

22.     Although at the time of the Merger, Buffets Restaurants Holdings, Inc. represented adequate positive cash flow for the operating entities, the financial results since the Merger have been far less than expected.  For example, sales were down twenty-two percent (22%) from the seller's projections.  This decline in the Debtors' cash flow performance combined with unanticipated expenses has caused a severe liquidity strain. Despite the Debtors' best efforts, the Debtors have fallen behind on their obligations to creditors.

23.     Due to the numerous underperforming restaurants, the Debtors closed and vacated 74 stores several weeks prior to the Petition Date and closed another 92 stores immediately preceding the bankruptcy filing which the Debtors will vacate within the next 7-10 days.

24.     As of the Petition Date, the Debtors continue to operate approximately 150 restaurants in over 25 states including Texas, California, Minnesota, Wisconsin, Michigan, Illinois, Colorado, Missouri, New York, New Jersey, Pennsylvania, Maine, Tennessee, Indiana, Washington, Oregon, Delaware, South Carolina, Louisiana, West Virginia, Ohio, Kentucky, North Carolina, Tennessee and Mississippi.

25.     The Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues. These efforts have included retaining a Chief Restructuring Officer, Bill Patterson of Bridgepoint Consulting, LLC, for the Debtors with the goal of consensually restructuring the Debtors' restaurant footprint and balance sheet.

26.     The Debtors have commenced these cases in order to fully implement their restructuring efforts and to deal with both legacy costs and those liabilities resulting from the store closures. The Debtors believe that once they shed themselves of the burdens associated with the Wyoming litigation and the unprofitable stores, they can focus their efforts on their

successful stores which will provide sufficient cash to fund the Debtors' ordinary course expenses and enable the Debtors to become a profitable enterprise.

## III.    First Day Motions

27.    Concurrently with the Chapter 11 petitions, the Debtors are filing "first-day" applications and motions described below (collectively, the "First Day Motions").  The relief sought in the various First Day Motions will allow the Debtors to, among other things, (a) establish certain administrative procedures to promote a seamless transition into Chapter 11; (b) continue to operate effectively; and (c) protect their assets and interests from any actions that may be taken by third parties.

28.    I submit this Declaration in support of the Debtors' petitions and First Day Motions filed with the Court in connection with the commencement of these cases.  Below is a brief discussion of the Debtor's First Day Motions and an explanation of why, in my belief, such motions are critical to the success of the Chapter 11 Cases.  More detailed descriptions of the facts pertaining to the Debtors' operations and the bases for the requested relief in each motion can be found in the relevant First Day Motions.

29.    I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

30.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm. At all times the Debtors' management and professionals remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability.

### A.      Motion for Joint Administration

31.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each and every Debtor. Under these circumstances, the Debtors believe the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes only.  The Debtors further believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest, and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

### B.      Motion for Authority to File a Consolidated List of the 30 Largest Unsecured Creditors, Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases

32.     The Debtors seek (a) authority to file a consolidated list of the 30 largest general unsecured creditors in lieu of submitting separate creditor lists for each Debtor, (b) authority to redact certain personal identification information for individual creditors, and (c) approval of the

form and manner of notice of commencement of these Chapter 11 Cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

33.    Because a large number of creditors may be shared amongst the Debtors, the Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "Top 30 List"). The Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service. Although they reserve the right to do so in the future, the Debtors are not requesting authority to file consolidated schedules of assets and liabilities and statements of financial affairs or substantively consolidate the Debtors.

34.    The Debtors submit that cause exists to authorize the Debtors to redact the address information of individual creditors — many of whom are the Debtors' employees from the Creditor Matrix because such information could be used to perpetrate identity theft. The Debtors propose to provide an un-redacted version of the Creditor Matrix to the Court, the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee"), and any official committee of unsecured creditors appointed in these Chapter 11 cases.

35.    Through Donlin, Recano & Company, the Debtors' proposed noticing and claims agent (the "Noticing and Claims Agent"), the Debtors propose to serve the Notice of Commencement, substantially in the form attached as Exhibit 1 to Exhibit A to the motion (the "Notice of Commencement"), on all parties entitled to notice of commencement of the Cases to advise them of the meeting of creditors under section 341 of the Bankruptcy Code. Service of the single Notice of Commencement will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix. Accordingly, the Debtors submit that service of a single Notice of Commencement is warranted.

36.     The Debtors believe an immediate and orderly transition into Chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.

      **C.**    **Motion for Authority to Use Cash Management System, Bank Accounts, and Business Forms; Perform Intercompany Transactions; Authority for Banks and Financial Institutions to Honor and Process All Related Check and Electronic Payment Requests**

37.     By this motion (the "Cash Management Motion"), the Debtors seek entry of an order (i) authorizing the Debtors to, in the ordinary course of business, (a) use existing cash management system, pre-petition bank accounts, and pre-petition business forms (without reference to the Debtors' status as a debtor-in-possession) and (b) perform intercompany transactions, (ii) authorizing the Debtors' banks and financial institutions to (a) maintain, service, and administer the Debtors' bank accounts and (b) honor and process all related checks and electronic payment requests consistent with the relief requested herein, and (iii) waiving the Debtors' compliance with the guidelines set forth in section 345(b) of the Bankruptcy Code.

38.     The Debtors have an established cash management system they utilize to collect, manage, and disburse funds used in the Debtors' operations in the ordinary course of business (the "Cash Management System"). A chart depicting the Cash Management System (the "Cash Management Banks") and related banks is attached to the Cash Management Motion as Exhibit B.

39.     The Cash Management System enables the Debtors to facilitate their cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of their bank accounts.

40. As discussed in greater detail in the Cash Management Motion, as of the Petition Date, the Debtors maintain the majority of their bank accounts with Bank of America, N.A. ("Bank of America") and Wells Fargo Bank, N.A. ("Wells Fargo"). Store cash receipts are ultimately swept in daily and weekly transfers to Wells Fargo into dedicated concentration accounts.

41. The Debtors currently generate and receive cash from the revenue generated pursuant to the operation of the Debtors' restaurant locations, which include on and off premises consumption of food.

42. In connection with the Cash Management System, the Debtors maintains eleven (11) bank accounts in their name (the "Bank Accounts"). A summary of the Bank Accounts is attached to the Cash Management Motion as Exhibit C. In the ordinary course of business, the Debtors routinely transfer money between the Bank Accounts via wire transfers and other electronic funds transfers. The number of intercompany transfers amongst the network of Bank Accounts can be in the hundreds on any given day since the cash is consolidated at the Buffets level and the applicable store may be owned by a different Debtor subsidiary. Thus, there could be inflow with deposits and outflow with disbursements. The amount of funds that flow through the Cash Management System is highly variable in that the funds are transferred between the various Bank Accounts each month.

43. As of the Petition Date, the active Cash Management System consists of the following categories of Bank Accounts and other related cash management activities:

Credit Card Payments By Customers.

44. If customer payment is made by credit card, the information is transmitted to the credit card merchant Vantiv ("Vantiv") at the end of the day. Settlement of the credit cards after

deduction of fees occurs within one to three business days from receipt from Vantiv at Wells Fargo.

<u>Cash and Check Payments by Customers.</u>

45.     If customer makes payment by cash or check at a restaurant with a "smart safe," the cash and checks are loaded into the smart safes and information is transmitted to Bank of America daily.  The Debtors then receive credit for cash the next business day.  The checks receive credit when they are received at the cash vault at Bank of America.  Thereafter, weekly pickups are made by Loomis or Brinks armored services to collect the cash and checks.  The stores generally will have either one or two pickups per week.  Cash collected by Loomis or Brinks is swept daily to Wells Fargo.

46.     If a customer makes payment by cash or check for stores without smart safes, daily deposits for the store are made by the manager on duty to a bank that is within a close radius to the store.  This bank could be a local or regional bank depending on the store location and city.  These banks are also identified on Exhibit C hereto.  These cash deposits are swept to Wells Fargo on either a daily or weekly basis.

<u>The Debtors' Intercompany Transactions</u>

47.     As reflected in Exhibits B and C to the Cash Management Motion, all receipts generated by the Debtors' operations are swept regularly to a concentration account at Buffets. Buffets and the other Debtors then utilize a series of transfers (collectively, the "<u>Intercompany Transactions</u>") between Buffets and the other Debtors in order to fund the payment of the Debtors' operating and administrative expenses, including, but not limited to, direct obligations of the applicable Debtors. Payments are made directly by Buffets for operating and administrative expenses, and in conjunction therewith, intercompany receivables and payables

are created for the Debtors in the ordinary course of business. The Debtors maintain current and accurate accounting records of the Intercompany Transactions principally through journal entries that are used to track and record the intercompany balances that exist across the Debtors' corporate structure. The Debtors will continue to maintain accurate records of the Intercompany Transactions and resulting intercompany claims during these Chapter 11 Cases.

48.     In addition to Intercompany Transactions among the Debtors for operating and administrative expenses, many of the operating and administrative expenses of the Debtors, to include payroll for employees other than Tahoe Joe's, are paid directly by FMP Ovation pursuant to FMP's management agreement with the Debtors.  Periodically, Buffets will advance or reimburse to FMP the costs associated with FMP's provision of management services, as well as a related monthly management fee.

<u>The Debtors' Existing Business Forms and Checks</u>

49.     In the ordinary course of business, the Debtors use numerous business forms, including, without limitation, checks, business cards, letterhead, purchase orders, and invoices (collectively, the "<u>Business Forms</u>"). Given the Debtors' well established cash management structure, to minimize the expense to the Debtors' estates associated with developing and/or purchasing new forms, the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, the Debtors seek authority to continue to use their Business Forms as such forms existed immediately prior to the Petition Date, without reference therein to the Debtors' status as a debtor in possession.

<u>Bank Fees and Charges</u>

50.     In the ordinary course, the Debtors' Cash Management Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service and

other fees, costs, charges, and expenses (collectively, the "Bank Fees"). In the six months preceding the Petition Date, the Bank Fees averaged approximately $58,865 per month.

51.     The Debtors request authority to use the Cash Management System during the pendency of these Chapter 11 Cases in accordance with the ordinary course of the Debtors' businesses.

52.     The Debtors further request that the Court authorize the Cash Management Banks to (a) continue to maintain, service, and administer the Bank Accounts, (b) debit the Bank Accounts in the ordinary course of business on account of (i) all checks drawn on the Bank Accounts that are cashed at the Cash Management Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) all checks or other items deposited in one of the Bank Accounts at the Cash Management Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (iii) all undisputed pre petition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of any aspect of the applicable Cash Management System, and (c) recognize and give effect to the transfers between the various Bank Accounts as contemplated herein.

53.     Furthermore, to guard against improper transfers resulting from the post-petition honoring of prepetition obligations, the Debtors request that their banks be directed not to honor, subject to certain exceptions approved by the Court (such as employee benefits and utilities), any checks and disbursements, including automatic or "ACH" withdrawals drawn on the Debtors' bank accounts, or for obligations, prior to the Petition Date, and not to honor any checks or disbursements drawn Prepetition on the Bank Accounts.

54.     Allowing the Debtors to maintain uninterrupted use of the Cash Management System and Bank Accounts will accomplish the dual goals of minimizing the disruption to the Debtors' operations and satisfying the United States Trustee's Operating Guidelines. To ensure that all transfers and transactions will be documented in its books and records, the Debtors will maintain records of all transfers within the Cash Management System.

55.     Here, the Debtors have utilized the Cash Management System as part of their ordinary and usual business practices and as such, the Debtors believe that use of the Cash Management System falls within the purview of ordinary course transactions permitted under section 363(c)(1) of the Bankruptcy Code. Moreover, appropriate circumstances exist for the Courts to authorize the Debtors' use of the Cash Management System under sections 363(b)(1) and section 105(a) of the Bankruptcy Code.

56.     As an initial matter, the relief requested in this Motion will help minimize any disruption in the Debtors' business operations during the period between the Petition Date and the Debtors' emergence from Chapter 11 and preserve the value of the Debtors' estates.

57.     Second, strict adherence to the Guidelines of the Office of the United States Trustee (the "U.S. Trustee") will prove to be exceedingly burdensome to the Debtors and management, reduce efficiencies, and cause unnecessary expense. Absent the relief requested herein, the Debtors will be required to, among other things, (a) close all existing bank accounts and open new debtor in possession accounts, (b) maintain a separate debtor in possession account for cash collateral, (c) obtain checks that bear the designation "debtor in possession", and (d) create new systems for manually issuing checks and paying post petition obligations. The delays that will result from opening the new accounts and revising cash management procedures would disrupt the Debtors' business operations at this critical time, have little or no benefit to the

Debtors' estate, and potentially erode the value of the Debtors' business. Accordingly, the Debtors should be allowed to use the Cash Management System consistent with the ordinary course of the Debtors' business.

58.     The Debtors use numerous varieties of Business Forms in the ordinary course of business.  By virtue of the nature and scope of the Debtors' business operations, and in order to minimize expenses to the Debtors' estate, it is important that the Debtors be permitted to continue using the existing Business Forms without alteration or change, except as requested herein.

59.     Furthermore, parties doing business directly with the Debtors undoubtedly will be aware of the Debtors' status as a debtor in possession as a result of the communications and notice of the commencement of these Chapter 11 Cases that the Debtors will distribute to such parties. Accordingly, the requirement to change the Business Forms is unnecessary, would be unduly burdensome, and should be waived.

60.     The U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Given the Debtors' current operations, it is necessary for the Debtors to conduct transactions by debit, wire, automated clearing house ("ACH") transfers, ACH credit, ACH debit, and other similar methods of electronic transfers. Denying the Debtors the opportunity to conduct transactions by these methods would likely interfere with the Debtors' performance under its contracts and obligations, unnecessarily distract the Debtors and its management from the Debtors' business operations, and create additional costs to be borne by the Debtors and their creditors. Accordingly, the Debtors believe that it is imperative that the Cash Management Banks be authorized to continue

to pay, honor, and execute any and all debit instructions, wires, ACH payments, and other forms of electronic transfers issued and drawn on the Bank Accounts after the Petition Date.

61.     The continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses and preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.  Because the Debtors' businesses are operationally and functionally interconnected to their affiliates, they maintain the centralized Cash Management System described above that necessarily requires numerous Intercompany Transactions. Altering this system would require the Debtors to divert attention from their restructuring efforts and the desired smooth transition into operating as a debtors in possession. In contrast, the continuation of the Intercompany Transactions helps preserve the "business as usual" atmosphere and avoids the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System. Accordingly, the Debtors should be expressly authorized to continue performing the Intercompany Transactions consistent with the Debtors' customary practice.

62.     Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate, is in the best interests of their estates, creditors, and other parties in interest, and should be granted in all respects. Moreover, this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

**D.     Motion for Extension of Time to File Schedules and Statements, Extending the Time to Schedule the Meeting of Creditors, and Allowing Debtors' Schedules and Statements to Reflect Assets and Liabilities as of March 2, 2016**

63.     Pursuant to the Motion to Extend Time, the Debtors seek entry of an order (i) extending the time within which the Debtors must file their (a) statement of financial affairs, (b) schedule of assets and liabilities, (c) schedule of current income and expenditures, and (d)

schedule of executory contracts and unexpired leases (collectively, the "Schedules and Statements"); (ii) authorizing the Office of the United States Trustee for the Western District of Texas to schedule the meeting of creditors under section 341 of the Bankruptcy Code after the forty (40) day deadline imposed by Bankruptcy Rule 2003(a); and (iii) allowing the Debtors to file Schedules and Statements to reflect assets and liabilities as of March 2, 2016.

64.     The Debtors have begun compiling the information required to complete their Schedules and Statements. Nevertheless, as a consequence of the complexity of the Debtors' business operations, coupled with the limited time and resources available, the Debtors have not yet finished gathering such information.

65.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, and the volume of information that must be reviewed, prepared, and included in their Schedules and Statements, the Debtors anticipate that they will be unable to complete their Schedules and Statements within the time required under Bankruptcy Rule 1007. Moreover, I believe that focusing the attention of key accounting and legal personnel on vital operational and restructuring matters during the critical first weeks after filing the Chapter 11 Cases, rather than on preparing their Schedules and Statements, will facilitate the Debtors' smooth transition into Chapter 11 and maximize the value of the Debtors' estates for the benefit of creditors and all parties in interest. Accordingly, the Debtors seek an additional thirty (30) days by which to file the Debtors' Schedules and Statements with the Court.

66.     The Debtors require extra time to prepare and file their Schedules and Statements. While the Debtors have commenced the task of gathering the necessary information that will enable them to finalize the Schedules and Statements, the nature and scope of the Debtors'

operations require them to maintain voluminous records and intricate accounting systems. The Debtors also have limited staff available to perform the required internal review of such financial records and affairs. Thus, the scope of the Debtors' businesses, the limited staff available to perform the required preparation activities, the numerous critical operational matters that their accounting and legal personnel must address in the early weeks of the Chapter 11 Cases, the pressures incident to the commencement of the Chapter 11 Cases, and the fact that certain prepetition invoices have not yet been received or entered into their accounting systems provide ample cause justifying, if not necessitating, an additional thirty (30) days to file their Schedules and Statements.

67. In addition, preparing and finalizing their Schedules and Statements within the next month will unnecessarily distract management's and the Debtors' professionals' attention from (a) focusing on the Debtors' business operations and reorganization efforts, including preservation of relationships with creditors and other parties-in-interest and (b) ensuring the Debtors' smooth transition into Chapter 11 during a sensitive time.

68. The Debtors anticipate that the United States Trustee will soon schedule the meeting of creditors required by section 341 of the Bankruptcy Code in accordance with Bankruptcy Rule 2003(a), but that the United States Trustee may desire to instead schedule the meeting after the Debtors' Schedules and Statements are filed. To the extent such relief is necessary, the Debtors also request the Court authorize the United States Trustee to schedule the Section 341 meeting after the 40-day deadline imposed by Bankruptcy Rule 2003(a).

69. The Debtors operate on a weekly accounting cycle beginning Thursday and ending Wednesday of the following week ("Weekly Accounting Cycle"). As of the Petition Date, the Debtors last complete Weekly Accounting Cycle ended on Wednesday, March 2, 2016.

70. The Debtors maintain voluminous books and records and a complex accounting system which is based on their Weekly Accounting Cycle. To prepare the Schedules and Statements based on a date different from the Weekly Accounting Cycle will require substantial time and effort on the part of the Debtors and its employees. The amount of work required in creating Schedules and Statements based on the Petition Date will interfere with the competing demands upon the Debtors' employees during the initial postpetition period. Moreover, the proposed "as of" date of March 2, 2016 will not prejudice creditors and other parties-in-interest as the Debtors believe using the Weekly Accounting Cycle will result in accurate Schedules and Statements.

71. For these reasons, the Debtors request that the Court grant the Debtors an additional thirty (30) days to file their Schedules and Statements, authorize the U.S. Trustee to schedule the 341 meeting after the 40-day deadline is imposed pursuant to Bankruptcy Rule 2003(a) and allow the Debtors to file Schedules and Statements to reflect assets and liabilities as of March 2, 2016.

**E.  Motion for Authorization, But Not Directing, Debtors to Pay Taxes and Fees, and Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests**

72. By this motion, the Debtors request an Order authorizing, but not directing, the Debtors to pay certain unpaid taxes and fees, and (ii) authorizing banks and financial institutions to honor and process all checks and electronic payment requests related to the foregoing.

73. In the ordinary course of business, the Debtors (a) pay certain taxes (collectively, the "Taxes") and fees and other similar charges and assessments (collectively, the "Fees," and together with Taxes, the "Taxes and Fees") to various taxing, licensing, regulatory, and other governmental authorities (the "Taxing Authorities") in order to conduct their business in the ordinary course of business. The Taxing Authorities include, but are not limited to, those listed

on Exhibit B to the motion (the "List of Taxing Authorities"). Although the Debtors believe that the List of Taxing Authorities is substantially complete, some Taxing Authorities may have been omitted inadvertently. Accordingly, the Debtors reserve the right to supplement or amend the List of Taxing Authorities as needed. Further, the relief requested herein is applicable with respect to all Taxing Authorities and is not limited to those Taxing Authorities listed on the List of Taxing Authorities.

74.     The Taxes and Fees incurred by the Debtors generally consist of sales and use taxes, franchise and excise taxes, gross receipts taxes, unemployment taxes, and other charges and assessments. Although the Debtors have made an extensive and good faith effort to identify all Taxes, Fees, and Taxing Authorities, the Debtors reserve the right to promptly file supplements to this Motion. In the aggregate, during the 12 month period preceding the Petition Date, the Debtors have paid approximately $56 million in Taxes and Fees to various Taxing Authorities. As of the Petition Date, the Debtors believe they may owe approximately $5.2 million in outstanding Taxes and Fees, for which the Debtors are seeking from the Court authorization, but not direction, to pay or to fund. The Debtors do not admit that there is liability with respect to any tax, fee, assessment or other claim against the Debtors. Accordingly, the Debtors seek the Court's authorization, not direction, to pay and or fund any such outstanding amounts.

75.     The Debtors incur certain state and local taxes imposed on the sale of certain goods and services (*e.g.*, liquor sales) and various other state or local taxes, charges, fines, penalties, and fees, including, without limitation, any amounts required to be incurred, or collected pursuant to applicable law. The Debtors' records indicate that, as of the Petition Date, they owe approximately $4.5 million in the aggregate that the Debtors would typically pay or

fund in the ordinary course of their business with respect to such sales, use, franchise, excise and gross receipts taxes. The Debtors are seeking from the Court authorization, but not direction, to pay and/or fund such sales, use, franchise and excise taxes.

76.     The Debtors are also responsible for paying certain federal and state unemployment taxes under federal and state unemployment tax laws in the ordinary course of their business. The Debtors incurred unemployment tax liabilities of approximately $2 million for calendar year 2015. As of the Petition Date, the Debtors owe approximately $700,000 in outstanding unemployment taxes. The Debtors are seeking from the Court authorization, but not direction, to pay such outstanding unemployment taxes.

77.     The Debtors' failure to pay the Taxes and Fees could materially and adversely impact their business operations and threaten the Debtors' reorganization in several ways. First, the Taxing Authorities could initiate additional audits of the Debtors or prolong existing audits, which would unnecessarily divert the Debtors' focus and attention from the tasks required by the reorganization process at a critical time for their businesses. Second, the Taxing Authorities may attempt to suspend the Debtors' operations, or the operations of their affiliates, file liens, seek to lift the automatic stay, and/or pursue other remedies that not only would be administratively burdensome to the Debtors' estates, but could also have disastrous consequences on the Debtors' business operations. Third, the Debtors' failure to pay such Taxes or Fees to the Taxing Authorities could cause the Debtors to incur late fees, penalties, and other charges.

78.     Accordingly, the Debtors' have a sound business reason for requesting to pay the Taxes and Fees because the failure to pay such Taxes and Fees could have a material adverse impact on the Debtors' day-to-day operations.

**F.      Motion for Order Authorizing Debtors to Pay Pre-Petition Wages and Other Compensation, and Employee Benefits, and Continue Existing Employee**

**Benefit Plans and Programs; Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests; Approving the Debtors' Discretionary Employee Incentive Programs**

79.     By this motion, the Debtors are seeking an order (i) authorizing the Debtors, in their sole discretion, to (a) pay pre-petition and post-petition wages and other compensation, employee business expense allowances and reimbursements, employee benefits, and (b) continue existing employee benefit plans and programs, (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, and (iii) approving the Debtors' discretionary employee incentive programs.

80.     The Debtors' success in their restructuring efforts will be highly dependent on the continued support and performance of its workforce.

81.     Debtors Buffets, LLC, Hometown Buffet, Inc., OCB Purchasing Company, LLC, OCB Purchasing, Co., Ryan's Restaurant Group, LLC, and Fire Mountain Restaurants, LLC (collectively "Non-Tahoe Joe Debtors") do not have any employees.  FMP Ovation employs the employees who perform a broad spectrum of services for the Debtors, including, without limitation, marketing, food and supply procurement, restaurant management, front of house service, kitchen services, finance and accounting, and information technology services (the "Employees").

82.     In the period prior to the Petition Date, there was approximately 15,325 salaried and hourly FMP Ovation employees working at the non-Tahoe Joe's Inc.'s restaurants.  As a result of the Debtors closing 92 stores immediately preceding the bankruptcy filing, the Debtors estimate that postpetition approximately 9,000 salaried and hourly employees will work at the non-Tahoe Joe's Inc.'s restaurants.

83.     In connection with the salaries and wages paid to Employees, FMP Ovation also handles as required by law withholding from their Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare Taxes (collectively, the "Employee Withholding Taxes") and remit same to the applicable taxing authorities.  FMP Ovation also handles deduction of certain amounts from Employees' paychecks, including, without limitation, garnishments, child support and service charges, and similar deductions.

84.     Non-Tahoe Joe Debtors prior to each pay day, advance FMP Ovation the funds necessary to pay the Employees.

85.     The Debtors have structured the employment of the restaurant employees this way to efficiently reduce overhead expenditures and take advantage of the cost savings associated with consolidating back office functions with the other non-debtor companies affiliated with FMP and FMP Ovation.

86.     The Debtors have six different pay periods based in part on the restaurant locations.

87.     Non-Tahoe Joe Debtors have the following five payroll cycles:

| Cycle | Next Pay Date | Pay Period / Arrearage Arrearage | Last Paid Date | Average Payroll |
|---|---|---|---|---|
| 1 | 3/9/16 | Bi-weekly/2 week in arrears | 2/24/16 | $2,154,000 |
| 2 | 3/15/16 | Bi-weekly/6 days in arrears | 3/1/16 | $42,000.00 |
| 3 | 3/16/16 | Bi-weekly/1 week in arrears | 3/2/16 | $1,850,694.31 |
| 4 | 3/9/16 | Weekly /1 week in arrears | 3/2/16 | $74,000.00 |
| 5 | 3/18/16 | Bi-weekly /10 days in arrears | 3/4/16 | $960,497.04 |

88.     The sixth payroll period is for Debtor Tahoe Joe's, Inc.'s Employees.

89.     Tahoe Joe's Inc.'s has its own employees.  In the months leading up to the Chapter 11 filing, the Debtors were in advanced discussions with third parties regarding a potential sale of Tahoe Joe's.   To keep Tahoe Joe's "separate" and thus ease a sale of the enterprise to a third party, the Debtors did not migrate Tahoe Joe's employees to FMP Ovation.   Unfortunately, no sale was able to be consummated prior to the Petition Date.

90.     Therefore, in the ordinary course of business, Debtor Tahoe Joe's Inc., employs its workforce and uses a payroll processor, Automatic Data Processing, Inc. ("ADP"), to pay bi weekly payroll to both hourly and salaried employees.  The next payday is March 16, 2016 for the period of March 3, 2016 to March 16, 2016.

91.     Debtor Tahoe Joe's Inc. averages gross bi-weekly compensation for Employees, including wages, salaries, and other compensation which totaled approximately $500,000 immediately prior to the Petition Date

92.     Employees of Tahoe Joe's Inc. perform a broad spectrum of services, including, without limitation, marketing, food and supply procurement, restaurant management, front of house service, kitchen services, finance and accounting, and information technology services.

93.     A vast majority of the Employees rely exclusively on the payments and other benefits they receive from the Debtors for their basic living necessities. If the Debtors do not pay the obligations for compensation, benefits and reimbursable expenses, the Employees will face significant financial difficulties. Moreover, Employee morale and loyalty will be jeopardized at a time when the support of the Employees is critical to the Debtors' success. In the absence of honoring the Debtors' pre-petition obligations to the Employees, the Employees may seek alternative employment opportunities. Accordingly, it is essential to pay and honor obligations to Employees.

94.     As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Employee Wages (excluding Payroll Taxes and Deductions, defined below, but inclusive of wages paid by both Tahoe Joe's and FMP Ovation) earned prior to the Petition Date that remain unpaid totals approximately $3,700,000 (the "Unpaid Wages").

95.     By this Motion, the Debtors request authority to pay all Unpaid Wages to the Employees in the ordinary course of business. The Debtors have made careful inquiries and have taken diligent steps to ensure that none of the Employees are owed more than $12,475 for Unpaid Wages as of the Petition Date. Accordingly, the Debtors believe that no individual Employee will be paid more than the statutory priority cap if this Court grants the requested relief.

Employee Business Expenses

96.     In the ordinary course of the Debtors' business and as is customary with most large businesses, the Debtors reimburse Buffets, LLC for certain expenses the Employees incur in the scope of their employment (the "Reimbursable Expenses"). Most employees initially incur and pay such expenses by using corporate credit cards. The Reimbursable Expenses are largely composed of ordinary and necessary expenses including cell phone, internet, hotel and airfare charges, meals, equipment, marketing inserts, airfare, tolls, parking, mileage, employee incentives, and postage.

97.     As of the Petition Date, the Debtors estimate that approximately $350,000 of Reimbursable Expenses are charged on a monthly basis to the corporate credit cards.

98.     It would be patently inequitable to require Employees to personally bear any approved business-related expenses they incurred in furtherance of their responsibilities as Employees.

99.     Accordingly, the Debtors request authority, in their discretion and in the exercise of their business judgment, to continue to honor all of the Employees Reimbursable Expenses in the ordinary course of business, regardless of when such obligations arose and to continue to use the corporate credit cards

<u>Honoring Prepetition Checks and Electronic Transfers</u>

100.    Debtor Tahoe Joe's Inc. requests that, to the extent of funds on deposit, all applicable banks and other financial institutions shall be directed to receive, process, honor and pay all checks presented for payment and to honor all funds transfer requests made by the employees, whether such checks were presented or fund transfer requests were submitted prior to, or subsequent to, the Petition Date, Debtor estimates prepetition checks in transit aggregate up to $500,000.  Further, Debtor Tahoe Joe's Inc. requests authority to issue post-petition checks, or to effect post-petition funds transfer requests in replacement of any checks or funds transfer requests with respect to its prepetition employee obligations dishonored or denied as a consequence of the commencement of the Chapter 11 Case.

<u>Health Care Programs</u>

101.    The Non-Tahoe Joe Debtors thru Buffets maintain a self-funded health insurance program for certain of their employees (the "<u>Health Insurance Program</u>").  Through the Insurance Program certain of the employees receive health insurance through BCBS SC.

102.    Both the Debtors and the employees contribute to the premium payment requirements for these plans, however, Debtors pay approximately $375,000 a month for their portions of the medical premium.

103.    Debtor Tahoe Joe's Inc. offers medical coverage to employees administered by Kaiser Insurance offers multiple plans for employees to choose from.  Debtor Tahoe Joe's, Inc.

pays a portion of the premiums and employees make contributions via salary deduction, in varying amounts depending on the plans chosen.

104.    By this Motion, the Debtors seek authority to: (a) continue to provide the Health Insurance Program and Kaiser Insurance for the Employees in the ordinary course of business; (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees; and (c) pay any amounts owed under the Health Insurance Programs and Kaiser Insurance to the extent that they remain unpaid as of the Petition Date.

<u>Vacation, Sick, Holiday and Leave Benefits</u>

105.    FMP Ovation provides certain of the Employees with paid vacation time (the "<u>Vacation Time</u>") as well as paid sick time and other paid time off (collectively, with the Vacation Time, the "Paid Time Off"). These programs are typical and customary, and continuing to offer them is necessary for the Employees to remain during the reorganization process.

106.    Because Vacation Time and Paid Time Off are accrued and used by Employees on a continuous basis, it is difficult to precisely quantify the cost of accrued Vacation Time and Paid Time Off as of the Petition Date.  However, the Debtors estimate that as of the Petition Date the value of Vacation Time is approximately $1.6 million.

107.    By this Motion, the Debtors seeks authority to: (a) continue to provide Paid Time Off to the Employees in the ordinary course of business; (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees; and (c) pay any amounts to FMP Ovation it owes to Employees on account of Paid Time Off to the extent that such amounts remain unpaid as of the Petition Date.

<u>Employee Incentive and Bonus Programs</u>

108.    The Debtors have various other practices, programs and policies that provide important benefits for the Employees. These programs include, but are not limited to, a number of discretionary incentive plans designed to provide additional compensation and other benefits to Employees to encourage exceptional Employee performance for the benefit of the Debtors' business (collectively, the "Discretionary Employee Incentive Programs"). Specifically, the Debtors offer Bonus Programs to managers and directors as more fully described below.

Old Country Buffet, Country Buffet and HomeTown Buffet Profit Bonus Program for Restaurant Managers ("Buffet Manager Bonus Program")

109.    The Buffet Manager Bonus Program provides restaurant managers (i.e. Food Bar Managers, Service Managers, Kitchen Managers, General Managers, and Senior General Managers) for each restaurant location with a percentage bonus based on profitability of a store over a fiscal year. The potential bonus percentage payout is distributed to operational leadership as follows: (i) Food Bar Manager: 0.75%; (ii) Service Manager: 1.5%; (iii) Kitchen Manager: 1.5%; and (iv) General manager or Senior General Manager: 6%. The maximum bonus is capped at 9.75% per restaurant

Area Directors Profit Bonus Program

110.    The Area Directors Profit Bonus Program provides Area Directors with a percentage bonus based on the profitability of a restaurants within an area during a fiscal year period.

Ryan's and Fire Mountain Profit Bonus Program for Restaurant Managers ("Ryan and Fire Mountain Manger Bonus Program")

111.    The Ryan and Fire Mountain Bonus Manager Bonus Program provides restaurant managers (i.e. Hospitality Managers, Kitchen Managers, General Managers or Senior General Managers) for each restaurant location with a percentage bonus based on profitability of a store

over a fiscal year. The potential bonus percentage payout is distributed to operational leadership as follows: (i) Hospitality Manager: 1.5%; (iii) Kitchen Manager: 1.5%; and (iv) General Manager or Senior General Manager: 6%. The maximum bonus is capped at 9.0% per restaurant.

### Tahoe Joe's Profit Bonus Program for Director of Operations

112.    The Tahoe Joe's Profit Bonus Program for Director of Operations provides the Director of Operations for Debtor Tahoe Joe's Inc. with a percentage bonus based on the profitability of a restaurants within an area during a fiscal year period.

### Tahoe Joe's Restaurant Manager Profit Bonus Program

113.    The Tahoe Joe's Restaurant Manager Profit Bonus Program provides restaurant managers (i.e. Service Manager, Culinary Operations Manager, General Managers) for each restaurant location with a percentage bonus based on profitability of a store over a fiscal year. The potential bonus percentage payout is distributed to operational leadership as follows: (i) Service Manager: 1.0%; (ii) Culinary Operations Manager: 3.0%; and (iii) General Manager: 6%. The maximum bonus is capped at 10.0% - 11% per restaurant.

114.    The Debtors request authority to continue to honor each of the Discretionary Employee Incentive Programs after the Petition Date, as such programs may be modified, amended or supplemented from time to time in the ordinary course of the Debtors' operations, including payment of any pre-petition amounts outstanding on account of the Discretionary Employee Incentive Programs, solely upon entry of a final order granting this Motion.

115.    To maintain the Debtors' operations and preserve the value of their estates, it is essential that the Debtors continue to operate, to the extent possible, in the ordinary course of business. To achieve that result, the Debtors must retain the uninterrupted service and loyalty of

its lifeline, which is the Employees. Payment of the Employee Compensation and continuation or satisfaction of the Employee Obligations and related arrangements is essential to this goal. Accordingly, the Debtors submit that the relief requested herein is critical to its ability to operate effectively and to preserve the value of the estates throughout this Chapter 11 Cases and, therefore, is in the best interests of the Debtors and their estates. Moreover, this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

116.    The Debtors are not seeking to satisfy the Employee Obligations in amounts that exceed the Statutory Cap in the aggregate per Employee, as calculated under sections 507(a)(4) and (a)(5) of the Bankruptcy Code. Accordingly, granting the relief sought with respect to compensation affects only the timing of payments to Employees. Indeed, the Debtors submit that payment of Employee Obligations up to the Statutory Cap per individual will enhance value for the benefit of the Debtors' estates because it will help ensure that the Employees--the lifeblood of the Debtors' business operations--will continue to provide vital services to the Debtors at this critical juncture. In addition, to the extent that the Debtors are authorized, in a reasonable exercise of their business judgment, to honor or satisfy the Employee Obligations on a postpetition basis in the ordinary course of business, such payments will enhance the value of the Debtors' estate by preserving the going-concern value of the Debtors' business.

117.    The Debtors also seek authority to pay Payroll Taxes and other Deductions to the appropriate entities. These amounts principally represent Employee earnings that Employees, governments and judicial authorities have designated for withholding from Employees' paychecks. Indeed, certain withholdings, including child support and alimony payments, are not property of the Debtors' estated because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf.  In addition to causing undue hardship to certain

Employees, the failure to pay such Payroll Taxes and Deductions may result in the Debtors being inundated with inquiries from taxing authorities and garnishors regarding their failure to submit, among other things, taxes and child support and alimony payments, which are not the Debtors' property but have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the affected Employees may face legal action and/or imprisonment due to the Debtors' failure to submit these payments.

118.    Further, applicable federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority.  Moreover, because the Payroll Taxes are not property of the Debtors estates, the Debtors request that the Court authorize the Debtors to transmit the Payroll Taxes to the proper parties in the ordinary course of business.

119.    The Debtors submit that the relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption while the Debtors seek to consummate their proposed restructuring. Absent such payments, the Employees may seek alternative employment opportunities. Such a development will deplete the Debtors' workforce, hinder or preclude the Debtors' ability to meet its customer obligations at a time when the Debtors seek to conduct operations in a "business as usual" manner.

120.    To facilitate the implementation of the requested relief, the Debtors further request that the Court authorize and direct all Disbursement Banks to receive, process, honor and pay any and all checks drawn or electronic fund transfers from the Disbursement Accounts whether such checks or transfer requests were presented before or after the Petition Date, to the extent that such checks or electronic fund transfers are expressly identified by the Debtors as

relating directly to the authorized payments with respect to the Employee Obligations. The Debtors also seek authority to issue new postpetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the filing of this Chapter 11 Cases.

**G.      Motion for Authority to Continue Customer Programs and Honor Obligations**

121.    By this motion, the Debtors seek authority, but not direction, to continue to maintain and administer certain customer programs (as described below) and honor all pre-petition obligations earned by and owing to their customers related thereto in the ordinary course of business and in a manner consistent with past practice.

122.    The Debtors operate in highly competitive food services industries, including operating restaurants offering food and beverages, as well as providing catering services, where the quality of the customer experience is a defining factor in differentiating the Debtors from their competitors. As an integral component of their businesses, the Debtors have implemented certain customer programs (the "Customer Programs") upon which the Debtors rely to enhance revenues and profitability by, among other things, driving repeat business, attracting new customers, and generating revenue and earnings.

123.    The Debtors' liability for the Customer Programs depends on consumer demand, the Debtors' marketing initiatives and promotions and specific store performance at any given point in time.  Due to such variables, it is difficult to quantify the Debtors' obligations attributable to the Customer Programs at a particular point in time. The Customer Programs consist of, *inter alia*, the following promotional programs:

i.      senior discount of $.50 off a regular priced buffet;

ii.     a "Senior Deal" every Monday through Friday from 1:30p.m.-3:30 p.m. which adds a free drink to regular senior pricing;

iii.    "Family Night" every Thursday from 3:30 p.m. until close with kids' meals at $1.99 with the purchase of an adult meal;

iv.    "Military Monday" where service members, veterans, and their families receive a reduced-price buffet ($5.99 for lunch and $8.99 for dinner, with an additional $2 for drink-bundled stores);

v.    a standard 15% discount for active duty and retired military;

vi.    group sales discounts for tour buses (pricing varies); and

vii.    fundraising program allowing organizations to buy discounted meal tickets at a pre-agreed price and sell to the organization's supporters, with the organization retaining the price difference.

124.    In addition, the Debtors sell gift certificates and cards that could be redeemed like cash at any of the Debtors' restaurant locations (collectively, the "Gift Certificates"). As a result, the Debtors could be liable for any Gift Certificates that are redeemed at any given time. As of the Petition Date, the value of outstanding Gift Certificates is approximately $4,915,000.00.

125.    The Debtors also issue traditional coupons (the "Coupons") offering promotional items and discounts to current and potential customers. The Coupons enable customers to receive a discounted rate for their purchases at all the Debtors' stores. The Coupons represent a discount effective at the time of sale, and as such, do not constitute pre-petition liabilities. In an abundance of caution, however, the Debtors seek authority to honor all Coupons, whether issued pre-petition or post-petition, in the ordinary course of their business.

126.    The Customer Programs generate revenues by encouraging sales at the Debtors' stores and targeting specific customer segments who may otherwise be unlikely to purchase the Debtors' products and services. Accordingly, the Debtors seek authority to continue these promotional programs and honor any pre-petition obligations related thereto in the ordinary course of business.

127.     Maintaining the Customer Programs is critical for the Debtors to retain their most valuable customers, which are integral to the Debtors' operations. If the Debtors are unable to honor their obligations arising from the Customer Programs, they risk losing customers to their competitors. To the extent that honoring the Customer Programs requires a cash payment or otherwise imposes a cost on the Debtors' bankruptcy estates, the Debtors believe use of estate property a necessary cost of operating the Debtors' businesses and thereby preserving the Debtors' estates. Moreover, this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

128.     Given that any interruption or discontinuation of the Customer Programs could have a devastating effect on the Debtors' business, I believe the resulting benefits to the Debtors' stakeholders of granting the relief requested will far exceed any costs associated with the Customer Programs. Considering the potential loss of customer loyalty, goodwill and revenue absent the relief requested therein, the continuation of the Customer Programs is essential to the ongoing vitality of the Debtors' business. Accordingly, the Debtors request authorization to continue the Customer Programs in the ordinary course of business and to perform and honor the pre-petition obligations thereunder, as the Debtors deem appropriate in their business judgment.

## H.     Motion to Establish Critical Vendor Payment Procedures

129.     By this motion, the Debtors seek authority to establish critical vendor payment procedures.  In their day-to-day operations, the Debtors heavily rely on many suppliers and service providers.  The Debtors believe that the goods and services supplied by certain of their vendors are critical to their operations in that their business, or some arm of their business, could not continue to operate without access to such goods and services. As of the Petition Date, many of the vendors deemed critical by the Debtors have outstanding claims against the Debtors arising from prepetition deliveries of goods and prepetition performance of services. The Debtors

anticipate they will be able to continue to transact with a majority of the vendors on which their day-to-day business operations depend despite nonpayment by the Debtors of such vendors' prepetition claims. Nonpayment of the prepetition claims of certain of the Debtors' vendors, however, creates a significant risk of disruption to the Debtors' operations. Thus, the Debtors anticipate there will be instances in which payment of the prepetition claims of certain vendors will benefit all creditors because such payment will allow the Debtors' business to continue and avoid a likely loss, or to gain a likely economic advantage, disproportionate to the amount of such vendors' prepetition claims.

130.    Accordingly, the Debtors request that the Court establish Critical Vendor Payment Procedures (as defined below) by which the Debtors may pay certain amounts to Critical Vendors (as defined below). In exchange for payment by the Debtors of any Critical Vendor Claim (as defined below), the Debtors intend to require such Critical Vendor to agree to transact with the Debtors, for such duration of time as agreed between the Debtors and such Critical Vendor on Customary Trade Terms (as defined below), unless otherwise agreed by the Debtors and the Critical Vendor.

131.    The Debtors are in the process of evaluating the several thousands of goods and services vendors likely to have outstanding claims against the Debtors as of the Petition Date. The Debtors are in the process of analyzing which of their providers of goods or services are critical to their ability to operate their business and this would qualify as either Critical Vendors, and believe that numerous will so qualify.

132.    The Debtors are distinguishing "Critical Vendors" according to the following criteria:

a.    Whether (i) the goods and services supplied by a particular vendor are essential to the continued operation of the Debtors' business or some arm thereof and cannot be

obtained from any other vendor, or, could be obtained from another vendor only at such extra cost or at such delay as to outweigh the cost of paying the prepetition claim, or (ii) whether the vendor was in possession of valuable property of the Debtors that is necessary to their ability to generate revenue;

b.      Whether the cost of paying the prepetition claim of such vendor, to the extent that such claim is fixed, noncontingent, liquidated, and undisputed (the "Critical Vendor Claim"), is outweighed by the benefit such payment is likely to secure on behalf of the Debtors' estates and other creditors; and

c.      Whether such vendor would likely continue doing business with the Debtors notwithstanding nonpayment of prepetition claims, such as those vendors subject to long-term, non-terminable contractual commitments.

133.    According to the above criteria, the Debtors are considering, from the several thousands of vendors with whom the Debtors deal, a small group of vendors that the Debtors will likely deem to be Critical Vendors.  These vendors provide goods, and services to the Debtors necessary to enable the Debtors to retain their reputation, customer loyalty, and goodwill within the highly competitive food service industry. As many of the Debtors' restaurants are located in small and rural communities, several of the Critical Vendors are either sole-source suppliers or are the only vendors able to meet the Debtors' volume requirements such that it would take weeks to months for the Debtors to find alternate suppliers or service providers. In addition, many of the potential Critical Vendors are small companies and any one payment by the Debtors represents a significant portion of their income.

134.    Failure to obtain the necessary goods and services from such vendors would irreparably harm the Debtors' reputation and could result in loss of customer confidence, loyalty and patronage in favor of one of the Debtors' competitors. The Debtors' perceive a risk that, for certain of their Critical Vendors, a default by the Debtors would extinguish the Debtors' access to necessary goods, and services, because (i) the vendor providing the particular good or service will be put out of business by the Debtors' nonpayment, (ii) because the vendor will refuse to

continue doing business with the Debtors if their prepetition claim remains unpaid, or (iii) because the vendor may choose to continue doing business with the Debtors only upon the condition that the Debtors provide trade term accommodations such as advance deposits or payments by wire transfer prior to delivery. Additionally, the Debtors believe that vendors in possession of the Debtors' property may assert liens on such property and/or will not return such property to the Debtors in the ordinary course of business as long as their prepetition claims remain unpaid.

135.   The Debtors anticipate that there may be instances in which the Debtors will require authority to pay the prepetition claim of a Critical Vendor that has refused to continue to deal with the Debtors, that is at risk of going out of business, or that has demanded trade term accommodations the Debtors cannot meet, because the Debtors will be unable to operate their business or an arm thereof without the goods, and services provided by such Critical Vendor. The Debtors feel they will not be able to fulfill their duty to their estate and creditors to preserve the value of their businesses without the authority to pay the prepetition claims of those vendors the Debtors have identified as Critical Vendors as and when such payments prove necessary.

136.   Accordingly, the Debtors propose the establishment of the following procedures for payment of prepetition claims of Critical Vendors if and when such payments become necessary (the "Critical Vendor"):

a.      First, to the extent an entity claims a lien against property of any of the Debtors' estate to secure a Critical Vendor Claim (which lien, upon advice of counsel, the Debtors reasonably believe to be valid) and to the extent payment of such Critical Vendor Claim is, in the exercise of the Debtors' business judgment, in the best interests of their estates (to include agreeing to Customary Trade Terms, defined herein), the Debtors are authorized to pay up to 75% of such Critical Vendor Claim (with the balance agreed to be treated as an unsecured claim). The Debtors shall file with the Court and provide to the United States Trustee for the Western District of Texas (the "U.S. Trustee"), and any committee approved under section 1102 of the Code (the "Creditors Committee," and,

together with the U.S. Trustee, the "Notice Parties") an accounting, itemized by claims paid, of any debts so paid.

b.　　To the extent an entity asserts any Critical Vendor Claim, the payment of which the Debtors, upon advice of counsel, reasonably believe would be authorized under existing laws related to critical vendors and payment is in the best interests of the estates (to include agreeing to Customary Trade Terms, defined herein), the Debtors may pay up to 75% of such claim (with the balance to be treated as an unsecured claim). The Debtors shall file with the Court, and provide to the Notice Parties an accounting of each such claim paid, including the bases on which payment of such claim is warranted under existing law. Upon motion of any party in interest filed within thirty (30) days of such accounting, the Debtors (and the creditor paid) shall be required to show cause why payment of such claim should be deemed by the Court to be properly authorized. If the Court determines that a payment was not properly authorized, the Debtors are authorized to, in their discretion and without further order of the Court, declare that payments made to such Critical Vendor on account of its Critical Vendor Claim shall be deemed to have been in payment of then outstanding postpetition claims of such vendor without further order of the Court or action by any person or entity. In addition, such Critical Vendor shall immediately repay to the Debtors any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

c.　　Any entity provided with a copy of the Order authorizing these procedures shall be deemed on notice that a refusal to provide postpetition goods, or services to the Debtors by reason of non-payment of any prepetition debt, and despite assurance, in the form of a deposit or prepayment, that such entity will suffer no loss through provision of postpetition goods or services, absent good cause, constitutes a willful violation of section 362(a)(6) of the Code.

137.　　As a prerequisite to payment of any Critical Vendor Claim, the Debtors intend to require Critical Vendors to agree to transact with the Debtors postpetition on Customary Trade Terms (as defined below) for such duration of time as agreed to by the Debtors and the particular Critical Vendor, unless otherwise agreed to by the Debtors and the particular Critical Vendor.

138.　　"Customary Trade Terms" are those trade terms, which include, but are not limited to, credit terms, credit limits, historical pricing conventions, historical product volumes, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability and other applicable terms and programs acceptable to the Debtors, that were most favorable to

the Debtors and in effect between such Critical Vendor and the Debtors at any time during the 12 month period preceding the Petition Date; provided however, notwithstanding the foregoing, payment terms shall be no less favorable than either 'net 30' (paid 30 days from invoice date) or "net 10 – 2%" (which provides for a 2% invoice discount if the invoice is paid 10 days from invoice date). If after receipt of payment for any Critical Vendor Claim, a Critical Vendor refuses to continue to provide product, supplies or services upon the Customary Trade Terms as agreed to with the Debtors, then the Debtors may (i) declare that any payment made to such Critical Vendor on account of their prepetition claim shall be deemed to have been in payment of then outstanding post-petition claims of such Critical Vendor without further order of the Court or action by any person or entity; (ii) require that the Critical Vendor immediately repay to the Debtors any payments made to it on account of their prepetition claim, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise; and (iii) seek redress with the Court for failure to comply with the Customary Trade Terms.

139.    In the present case, many of the Critical Vendor claims will be entitled to priority status as administrative expenses and likely payment in full pursuant to section 503(b)(9) of the Bankruptcy Code because such claims arise from the delivery of goods to the Debtors, in the ordinary course of business, within the 20-day period preceding the Commencement Date.

140.    The Debtors submit that many of the Critical Vendor Claims likely arise from the delivery of goods to the Debtors in the ordinary course of business within the 20-day period preceding the Commencement Date. As such, these Critical Vendor Claims would likely be entitled to administrative expense status and to payment in full ahead of general unsecured creditors. Therefore, authorization of payment of many of the Critical Vendor Claims would not

unfairly discriminate against the Debtors' other unsecured creditors and raises merely an issue of timing.

141. Establishment of the Critical Vendor Payment Procedures by which the Debtors may pay the claims of those vendors whom the Debtors have distinguished as Critical Vendors is warranted. The Critical Vendor Payment Procedures will allow the Debtors to pay the Critical Vendor Claims, many of which will likely be entitled to priority administrative expense status pursuant to Bankruptcy Code section 503(b)(9). The Critical Vendor Payment Procedures will also ensure that no Critical Vendor holds the Debtors hostage and unreasonably demands payment of their prepetition claims. The Debtors believe that authority, but not direction, to pay the Critical Vendor Claims, as such payments become necessary, is crucial for the Debtors' seamless transition into Chapter 11, will avoid immediate and irreparable harm, and will serve the best interests of the Debtors, their estate, and their creditors.

**I.      Motion for Order Establishing a Procedure for Determining Claims Arising Under the Perishable Agricultural Commodities Act; Authorizing the Debtors to Pay Certain Pre-Petition Claims Arising Under the Perishable Agricultural Commodities Act**

142. By this Motion, the Debtors seek the entry of an order establishing a procedure for determining claims arising under the Perishable Agricultural Commodities Act of 1930 (as amended, modified, or supplemented from time to time, "PACA"), and any and all state statutes of similar effect, and (ii) authorizing, but not directing, the Debtors, in their sole discretion, to pay, in the ordinary course of business all claims of PACA Vendors (as defined in the motion, whose claims are identified therein collectively as the "PACA Claims" which claims include those of the Debtors' vendors who may also be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 et seq. ("PASA")).

143.     In the ordinary course of business, the Debtors engage various service providers, goods providers, and other vendors in connection with their operations, the absence of which will threaten the Debtors' ongoing restaurant operations. Without the goods and services provided by certain of these vendors, the Debtors' restaurants and operations as a whole will suffer immediate and irreparable harm. To ensure that the Debtors continue to receive a constant supply of fresh fruits and vegetables post-petition, the Debtors seek authority, but not direction, in their sole discretion, to continue to pay PACA Claims to those vendors who supply the Debtors with fruits and vegetables (each a "PACA Vendor", and collectively, the "PACA Vendors") in the ordinary course of business and consistent with their historical practices in effect prior to the Petition Date.

144.     The Debtors believe that a certain portion of the goods they purchase from vendors may qualify as "perishable agricultural commodit[ies]" under PACA. As a result, provided that the PACA Vendors abide by the notice requirements of PACA, they will be eligible to assert PACA Claims (see also footnote 2 of the motion) granting them priority ahead of all other secured and unsecured creditors in these Chapter 11 Cases.

145.     As of the Petition Date, the Debtors estimate they may owe PACA Vendors as much as $9.875 million in the aggregate for PACA goods delivered prior to the Petition Date. The Debtors expect to be invoiced for substantially all of the amounts owed to PACA Vendors within twenty-one (21) days following the Petition Date.

146.     It is essential that the Debtors be able to maintain their business relationships with, and honor outstanding payment obligations to, their PACA Vendors in light of the role that they play in the Debtors' continuation of their business.  In addition, various third parties who provide goods and services to the Debtors, such as the PACA Vendors, may be able to assert

liens against the Debtors' assets.  It is critical to the Debtors' business operations that the Debtors continue to receive without disruption goods and services from the PACA Vendors. The Debtors believe that without the relief requested herein, many of these vendors will cease delivering goods and providing services to the Debtors. Any such disruption would have a devastating effect on the Debtors' operations and their reorganization efforts.

147.     Accordingly, payment of PACA Claims at the outset of these Chapter 11 Cases will not prejudice or affect the amount available for distribution to other creditors of the Debtors. To ensure the continued, uninterrupted supply of fresh produce, it is important that the Debtors be authorized to pay all valid PACA Claims in the ordinary course of business and consistent with their historical practices.

148.     In these cases, the Debtors' operations require the seamless coordination of a multitude of unrelated third-parties at every stage in the supply chain. Collectively, the Debtors' supply chain ensures that the Debtors receive all of the food, products, and supplies necessary to operate their business and provide their customers with the high-quality food expected under the Debtors' brands.  Any significant disruption in the Debtors' supply chain, such as a vendor halting delivery of certain necessary goods and/or services, could result in the Debtors not having sufficient food, products and supplies to operate their business. Given the highly-competitive nature of the restaurant business, such a result could be detrimental to the Debtors' business and significantly impair their restructuring efforts.

149.     The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Specifically, the authority, but not

direction, to satisfy the PACA Claims in the initial days of these Chapter 11 Cases without disrupting the Debtors' business operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtor is willing and able to conduct business as usual during these Chapter 11 Cases.

150.    Authorizing the prompt and full payment of the PACA Claims will not prejudice the Debtors' creditors or any party-in-interest in these Chapter 11 Cases.

151.    Furthermore, payment of allowed PACA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and their PACA Vendors. Any delays in satisfying amounts owed to PACA Vendors could adversely affect the Debtors' ability to obtain fresh produce, thereby undercutting the Debtors' reorganization prospects. Failing to pay allowed PACA Claims in the ordinary course of business could subject the Debtors to numerous claims and adversary proceedings, including motions by PACA Vendors for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort and money by the Debtors.

152.    Lastly, in certain circumstances, officers, or directors, or members of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA.  Thus, to the extent that any valid obligations arising under PACA remain unsatisfied by the Debtors, the Debtors' officers or members may be subject to lawsuits during the pendency of these Chapter 11 Cases. Any such lawsuit (and ensuing potential liability) would distract the Debtors and their officers or members in their efforts to implement a successful reorganization strategy and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements and applicable laws to the detriment of the Debtors.

153.     The relief requested herein will not affect the recovery of creditors in these Chapter 11 Cases. As stated above, assets governed by PACA do not constitute property of the Debtors' estates.  Holders of PACA Claims are entitled to payment from the PACA Trust ahead of the Debtors' other creditors. The Debtors' requested relief affects only the timing of the payment of the PACA Claims, and will not prejudice the recovery of other creditors. In such instances, timely and immediate payment now only provides the PACA Vendors with what they would be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these Chapter 11 Cases.   Accordingly, payment to such claimants at the outset of these Chapter 11 Cases will not affect recoveries to other creditors under any chapter 11 plan, and instead, solely impacts the timing of these payments.

154.     The Debtors' accounts payable system does not segregate invoices for product that might qualify for PACA protections.  Accordingly, the Debtors request a procedure that requires all PACA Vendors to submit to the Debtors, in writing, a request for payment and invoices and/or supporting detail acceptable to the Debtors that will enable the Debtors to determine whether, and in what amount, the claim qualifies as a PACA Claim.  PACA Claims should be submitted to Bill Patterson, Chief Restructuring Officer at 120 Chula Vista Dr., San Antonio, Texas 78232.  The Debtors anticipate establishing a bar date expressly for PACA Claims, but is not seeking that relief at this time.  The Debtors will file with the Court, the United States Trustee and any statutory committee an accounting of all PACA Claims paid.  Upon motion of any party-in-interest filed within thirty (30) days of such accounting, the Debtors (and creditor paid) shall be required to show cause as to only the payment was properly authorized.  If the Court determines the payment was not properly authorized, the PACA Claimant shall immediately repay to the Debtors any payments authorized to the extent such exceed any amount

owed by the Debtors post-petition to such creditor, and the balance of the unauthorized payment shall be applied to reduce the outstanding post-petition debt owed to such creditor.

155.    The continuity and viability of the Debtors' business operations depends heavily on the uninterrupted delivery of essential food, products and supplies. The failure of any vendor to deliver essential food, products or supplies or to render services to the Debtors would have immediate and detrimental consequences to the Debtors' business and would decrease value to the detriment and prejudice to the Debtors. The Debtors cannot risk even the perception that their restaurants will offer anything but the highest level of food and beverage quality and quantity for the duration of these Chapter 11 Cases. Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the PACA Vendors is critical to their continued operations and greatly increases the likelihood of a successful reorganization. Accordingly, the relief requested in the PACA Motion is necessary to avoid immediate and irreparable harm.

**J.    Motion for Order Determining That Utility Providers Have Been Provided With Adequate Assurance of Payment; Approving Proposed Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services; Determining That Debtors Are Not Required to Provide Any Additional Assurance**

156.    By this motion, the Debtors seek an Order (i) determining that utility providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code by virtue of the proposed adequate assurance, (ii) approving the adequate assurance procedures as proposed in the motion, (iii) prohibiting utility providers from altering, refusing, or discontinuing utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the adequate assurance procedures, and (iv) determining that the Debtors are not required to provide any additional assurance beyond what is proposed in this motion.

157.    The Debtors incur utility expenses for electricity, telephone, water, waste disposal, internet, grease trap services and other essential services (collectively "Utility Services") in the ordinary course of their businesses. The utility providers (as that term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers") that deliver Utility Services to the Debtors as of the Petition Date include, but are not limited to, those listed on Exhibit C attached to the motion (the "Utility Provider List").  On average, the Debtors spend in the aggregate approximately $3,000,000 each month on Utility Services.  Further, prior to the Petition Date, the Debtors placed amounts on deposit with many of the Utility Providers as security for the Debtors' respective obligations (the "Pre-petition Security Deposits"). As of the Petition Date, in the aggregate, the pre-petition Security Deposits total approximately $2,471,000.

158.    As of the Petition Date, the Debtors were current on their utility bills and obligations to Utility Providers.

159.    Furthermore, for many of the Utility Providers, Utility Services are paid by direct debit from the Utility Provider against one of the Debtors' bank accounts.  The Debtors have control over any debits and review and approve any debits prior to release of funds.

160.    Preserving Utility Services on an uninterrupted basis to the Debtors' offices and restaurants is essential to the Debtors' ongoing operations and to the success of its reorganization. Any unplanned interruption of utility services for even a brief period of time will negatively impact the Debtors' operations, customer and business relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts. Thus, it is imperative that the Utility Providers continue to provide their Utility Services without interruption.

161.    Accordingly, the Debtors seek approval of the proposed adequate assurance procedures described below in the event that any Utility Provider makes a demand for adequate assurance or otherwise threatens to alter, refuse, or discontinue Utility Service to the Debtors.

Proposed Adequate Assurance

162.    The Debtors are current on all obligations for Utility Services to their Utility Providers. The Debtors intend to pay their post-petition obligations owed to the Utility Providers in the ordinary course, and by this motion also seek to pay all pre-petition amounts, as well, as adequate assurance of payment for Utility Services, in lieu of an additional deposit. The Debtors believe that payment of prepetition amounts is in the best interest of the estates because the Debtors are current on all obligations to Utility Providers and posting, by way of example, one additional month of estimated service for each Utility Provider would far exceed and actually be a greater detriment to the Debtors' cash flow than simply paying the Utility Providers in the ordinary course of business, to include payment of prepetition amounts.

163.    The Debtors also request, as additional adequate assurances, that the Utility Providers be allowed to continue to debit the Debtors' bank accounts for Utility Services, in the ordinary course of business.

164.    The Debtors assert that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from business operations, as well as expected debtor-in-possession financing.

165.    The Debtors submit that payment of any prepetition amount owed, in the ordinary course of business, and in conjunction with the continued ability to debit the Debtors' accounts for amounts owed, demonstrates the Debtors' ability to pay for future Utility Services in the

ordinary course of business and constitutes adequate assurance to the Utility Providers (the "Proposed Adequate Assurance").

Proposed Adequate Assurance Procedures

166.     Notwithstanding the Proposed Adequate Assurance and the fact that many Utility Providers are holding individual pre-petition Security Deposits, if any Utility Provider believes that additional adequate assurance is required, it may request such additional assurance pursuant to the procedures described below (the "Adequate Assurance Procedures"):

a.       Any Utility Provider requesting additional assurance of payment in the form of deposits, prepayments, or otherwise must serve a request for additional assurance (an "Additional Assurance Request") so that it is received by the following parties: (i) the Debtors, 120 Chula Vista Drive, Hollywood Park, Texas 78232; (ii) proposed counsel to the Debtors, John E. Mitchell, Akerman LLP, 2001 Ross Avenue, Suite 2550, Dallas, Texas 75201; (iii) the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee""), 615 E. Houston Street, Suite 533, San Antonio, TX 78205 (collectively, the "Notice Parties").

b.       Any Additional Assurance Request must (i) be made in writing, (ii) set forth the location for which Utility Services are provided, (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any Pre-petition Security Deposits, and (iv) set forth why the Utility Provider believes that the Proposed Adequate Assurance is not sufficient adequate assurance of future payment in accordance with section 366 of the Bankruptcy Code.

c.       Upon the Debtors' receipt of any Additional Assurance Request in accordance with the notice procedures described above, the Debtors shall have the greater of (i) twenty (20) calendar days from the receipt of such Additional Assurance Request or (ii) thirty (30) calendar days from the Petition Date (collectively, the "Resolution Period") to negotiate with the Utility Provider to resolve such Utility Provider's Additional Assurance Request.

d.       The Debtors may, in their sole discretion, resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court, and may, in connection with any such agreement, in its sole discretion, provide a Utility Provider with additional assurance of future payment, including, but not limited to, cash deposits, prepayments, or other forms of security, without further order of the Court if the Debtors believe that such additional assurance is reasonable.  Any such agreement may include a recharacterization of some or all of the Debtors' payment for prepetition Utility Services as a post-petition Adequate Assurance deposit.

e.      If the Debtors determine that the Additional Assurance Request is not reasonable and is not able to reach an alternative resolution with the Utility Provider during the Resolution Period, the Debtors, during or immediately after the Resolution Period, will request a hearing before the Court to determine the adequacy of assurances of payment with respect to such Utility Provider (the "Determination Hearing") pursuant to section 366(c)(3) of the Bankruptcy Code.  Any Determination Hearing scheduled will be without prejudice to the Debtors to seek return of any prepetition payments for Utility Services provided as Adequate Assurance, should the Utility Provider request additional security deposits as adequate assurance.

f.      Pending resolution of such dispute at the Determination Hearing, the relevant Utility Provider shall be prohibited from discontinuing, altering, or refusing service to the Debtors for any reason, to include on account of any objections to the Proposed Adequate Assurance.

g.      The Debtors will either fax, e-mail, serve by first class mail, or otherwise expeditiously send a copy of this Motion and the Orders, which include the proposed Adequate Assurance Procedures, to each Utility Provider within five business days after entry of the Orders by the Court.

h.      The Adequate Assurance Deposit attributable to each Utility Provider shall be returned to the Debtor on the earlier of (a) the Debtor's termination of such services from such provider; (b) the confirmation of a plan of reorganization; and (c) the conclusion of the Chapter 11 Cases, if not applied earlier.

167.      The Debtors further propose that all Utility Providers that do not timely file an objection to this motion, or make an Additional Assurance Request pursuant to the Adequate Assurance Procedures, be deemed to consent to the Proposed Adequate Assurance and be bound by any order entered by the Court granting this motion.

Modifications to Utility Provider List

168.      The Debtors intend to amend the Utility Provider List, in their sole discretion, to add any subsequently identified Utility Provider. The Debtors further propose that the Interim Order and Final Order (together, the "Orders") be deemed to apply to any such Utility Provider regardless of when a Utility Provider may be added to the Utility Provider List. The Debtors also will serve a copy of this Motion on any Utility Provider that is subsequently added to the Utility Provider List. Such subsequently added Utility Providers who object to Orders or to the entry of

the Orders must file an objection in accordance with the Bankruptcy Rules, the Local Rules of Court, and the Adequate Assurance Procedures.

169.     Here, the Debtors believe that the Utility Providers have "adequate assurance of payment" even without the proposed Adequate Assurance Deposit. As described above, the Debtors anticipate having sufficient resources to pay, and intend to pay, any and all valid post-petition obligations for Utility Services in a timely manner.  In addition, the Debtors' reliance on Utility Services for the operation of their business provides them with a powerful incentive to stay current on their utility obligations. These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that no adequate assurance payments other than staying current on both pre and post-petition amounts owed are required in the Chapter 11 Cases. The Debtors submit that the Proposed Adequate Assurance is sufficient to assure the Utility Providers of future payment.

170.     Notwithstanding the foregoing, the Debtors believe that the Proposed Adequate Assurance and the Adequate Assurance Procedures are reasonable, satisfy the requirements of section 366 of the Bankruptcy Code, and are necessary for the Debtors to carry out their reorganization efforts. If they are not approved, the Debtors could be forced to address payment requests by Utility Providers in a disorganized manner, which would distract management from focusing on the Debtors' reorganization. Moreover, on the 30th day following the Petition Date, the Debtors could be surprised by a Utility Provider unilaterally (a) deciding that it is not adequately protected, (b) making an exorbitant demand for payment to continue service, or (c) discontinuing service. Such discontinuation of or higher payment demands for Utility Services could jeopardize the Debtors' reorganization efforts.

171.    The proposed Adequate Assurance Procedures are necessary for the Debtors to carry out their restructuring efforts. If the Court does not approve the proposed Adequate Assurance Procedures, the Debtors could be forced to address requests from Utility Providers in a disorganized manner at a critical point in the restructuring process.

172.    In this case, preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations. Indeed, any interruption in Utility Services, even for a brief period of time, would immediately and irreparably harm the Debtors' business. Accordingly, it is imperative that the Utility Providers continue to provide their Utility Services without interruption.

**K.    Motion for Order Authorizing, But Not Directing, Debtor to Maintain Existing Insurance Programs and Existing Insurance Premium Financing Agreement, and Fund All Obligations in Respect Thereof**

173.    By this motion (the "Insurance Motion"), the Debtors seek an order (i) authorizing, but not directing, the Debtors to (a) maintain the Debtors' existing insurance programs and premium financing agreement on an uninterrupted basis in accordance with their historical practices and (b) fund all premiums, deductibles, fees, and other obligations in respect thereof, whether relating to the prepetition or post-petition period.

174.    In connection with the operation of the Debtors' business, the Debtors maintain comprehensive insurance programs (collectively, the "Insurance Programs") that include a variety of policies through several different insurance carriers (collectively, the "Insurance Carriers"). A detailed list of the Insurance Programs is attached to the Insurance Motion as Exhibit B. Insurance programs as used in the Insurance Motion is intended to include all of the Debtors' insurance policies and programs whether listed on Exhibit B or not. While the Debtors believe Exhibit B is all inclusive, given the number of states in which the Debtors operate and

the multitude of policies, it is possible that one or more policies were inadvertently omitted from Exhibit B.

175.    The Insurance Programs name the Debtors' parent, Buffets Restaurant Holdings, Inc. ("BRHI") as the primary named insured and the Debtors as named insureds.

176.    The premiums with respect to the Insurance Programs are financed pursuant to a premium financing agreement between Bank Direct Capital Finance and Buffets Holdings, LLC ("BH"), a true and correct copy of which is attached to the Insurance Motion as Exhibit C.

177.    The Insurance Programs protect the Debtors and their personnel against various risks that may arise in the course of the Debtors' business.

178.    In order to protect the Debtors against such risks, the Insurance Programs include the following types of coverage:

   a.     General Liability and Property Policies. These policies, including related excess policies, provide coverage for claims relating to, among other things, slip and falls and other accidents by customers while patronizing the Debtors' restaurants, sickness caused by food served, damage to property used by the Debtors in their restaurant operations.

   b.     Workers Compensation Policies. These policies, including related excess policies, provide coverage for injuries suffered by the Debtors' employees in the course of their employment.

   c.     Management Liability Policy. These policies, including related excess liability policies, covers the Debtors, directors, officers, managers and business entities from claims arising out of their governance, finance, benefits, employment and management activities on behalf of the Debtors.

   d.     Auto Liability Policy. These policies, including related excess liability policies, maintains business auto liability policy on the Debtors' behalf which provides automobile coverage for vehicles used in Debtors' business, including for off-site deliveries and catering.

   e.     Crime and Flood. These policies protect the Debtors against losses caused by crime against the Debtors or floods.

179.    The Debtors seek from the Court authorization, but not direction, to maintain the Insurance Programs on an uninterrupted basis in accordance with their historical practices.

180.    The Debtors have indirectly incurred and continue to incur certain obligations relating to the Insurance Programs (such obligations, including those which accrued prior to the Petition Date, the "Insurance Obligations").  Absent payments by the Debtors for the purpose of funding the Insurance Obligations, the Insurance Programs and the Premium Financing Agreement will not be funded and the Debtors' coverage under the Insurance Programs can be voided.  Disruption of the Debtors' insurance coverage will expose the Debtors to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs, (c) losing good-standing certification to conduct business inasmuch as the jurisdiction in which it operates requires the Debtors to maintain certain levels of insurance coverage, (d) being unable to obtain similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

181.    The different categories of Insurance Obligations include (a) fixed-rate premiums based on a rate established by each Insurance Carrier, which are generally payable on an annual basis, but which are financed through the Premium Financing Agreement, (b) deductibles and other fees related to the Insurance Programs, including a self-insured retention with respect to worker's compensation policies all or a portion of which the Debtors fund out of cash flow in the ordinary course of business, (c) payments to insurance agents and brokers who assist with the procurement and negotiation of the Insurance Programs, which payments are generally financed through the Premium Financing Agreement, (d) a claims administrator who manages worker's compensation and general litigation claims, and (e) monthly payments in the amount of

$197,074.58, which the Debtors make pursuant to the Premium Financing Agreement. The Debtors also funded $750,000 toward the down payment on the Premium Financing Agreement.

182.    In the aggregate, for the 12 month period beginning July 7, 2015, the Debtors will or have paid in the aggregate approximately $2.5 million to facilitate the payment of Insurance Obligations.

183.    Accordingly, the Debtors seek this Court's authorization, but not direction, to pay any such outstanding amounts and other amounts as may come due in order to maintain their insurance coverage.

184.    The Debtors submit that appropriate circumstances exist to justify the continuation of the Insurance Programs in the ordinary course of business, as contemplated by the Insurance Motion. The relief requested will help minimize any disruption in the Debtors' business operations during the period between the Petition Date and confirmation of a Chapter 11 plan, as well as after its emergence from Chapter 11, thereby preserving the value of the Debtors' estate.

185.    Payment of the prepetition amounts associated with the Insurance Programs meets each element of the CoServ court's standard.  Insurance coverage is required by the United States Trustee's Guidelines. Moreover, as a fiduciary for the bankruptcy estates, the Debtors would be violating their duties if they in any way jeopardize the coverage provided under the Insurance Programs.

186.    As set forth above, the Debtors believe that payment of the various prepetition obligations sought to be paid under this Motion is necessary to ensure the continued functioning of the Insurance Programs, avoid litigation, prevent damage to business reputation, and/or, in

certain instances, to avoid running afoul of state laws. Accordingly, this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

187.    The relief requested in the Insurance Motion is necessary for the Debtors to continue their operations during the pendency of the Chapter 11 Case. If the Insurance Programs lapse, the Debtors will be required to obtain replacement insurance, likely at a cost greater than the cost of the current Insurance Programs. Furthermore, replacing the Insurance Programs would divert the time and resources of the Debtors' officers and/or managers away from the restructuring process. Thus, the Debtors submit that they have articulated sound business reasons for the prepetition payments sought thereunder.

188.    Here, the continuation of the Insurance Programs and payment of the Insurance Obligations are imperative to the Debtors' continued operations, ability to restructure, and preservation of value of their estates. It is essential for the Debtors to carry insurance in their day-to-day operations, or they run the risk of, among other harms, incurring financial responsibility and legal liability for potential occurrences not covered by insurance. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities.

189.    The Debtors need to minimize the risks associated with operating their business. Even a brief delay or suspension in the Debtors' ability to pay the Insurance Obligations could create significant risk that the Debtors would void or otherwise lose the benefits of the Insurance Programs. Disruption of the Debtors' insurance coverage would expose the Debtors to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance

Carriers under the Insurance Programs, (c) losing good-standing certification to conduct business in jurisdictions requiring the Debtors to maintain certain levels of insurance coverage, (d) being unable to obtain similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

190.    In light of the foregoing, the Debtors submit that the relief requested is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted in all respects.

**L.    Motion for Authority for the Debtors to Use Cash Collateral, Obtain Debtor In Possession Financing, and Determining Adequate Protection, Superpriority Claim and Liens**

191.    To continue their operations in an orderly manner on a post-petition basis, the Debtors need immediate authority to borrow funds pursuant to a loan agreement negotiated with Alamo CRG, LLC (the "DIP Lender"), which is also the proposed purchaser of the new equity to be issued under the Debtors' proposed plan.  The Debtors intend to borrow enough funds to operate in the ordinary course of business during these bankruptcy Cases.

192.    To obtain the requested credit, the Debtors request authorization to enter into post-petition financing agreements, the *Note and Security Agreement* (the "DIP Note") in substantially the same form as the agreement attached to the motion as Exhibit A with the DIP Lender on the terms summarized below:

a.    Advances for Operations – The DIP Lender will agree to advance $1,000,000.00 on an interim basis, and up to an additional $1,250,000.00 on a final basis.  Subsequent advances on notice up to an additional $2,000,000.00 may be made at the Lender's discretion.

b.    Budgeted Use of Funds – The Debtors will use such funds pursuant to the budget attached as Exhibit B to the motion (the "Budget").  The attached Budget identifies the Debtors' proposed expenses to be incurred and paid during the bankruptcy Cases, including payroll, landlords, inventory purchases, and bankruptcy professionals.  Debtors must comply with all line-items in the Budget, within 5% on a weekly basis, and 10% on an aggregate basis.

c.      Collateral – The DIP Note defines "Collateral" to be all of the Debtors' assets, including without limitation all accounts (except those purchased by Third Coast before the Petition Date), chattel paper, commercial tort claims, deposit accounts and securities accounts, documents, equipment, fixtures, general intangibles, goods, intellectual property, instruments, inventory, investment property, leases, all letters of credit, letter of credit rights, and other supporting obligations, all money, cash and cash equivalents, tax refunds and tax credits, all products and proceeds of any of the foregoing, including all insurance proceeds payable for the loss, damage or destruction of any of the foregoing provided, however, that "Collateral" shall exclude any avoidance and recovery actions under Chapter 5 of the Bankruptcy Code.

d.      Priming Liens – The DIP Lender's liens will be senior to any other party in interest.

e.      Interest – Interest will accrue at a rate of 7% per annum and, upon default, 10% per annum, and will be paid (pursuant to the Budget) on the first day of each month.

f.      DIP Lender's Fee – A fee of 1% or $20,000.00 shall be due at origination.  In addition, legal fees for up to $10,000.00 in connection with the loan shall likewise be due.

g.      Superpriority Claim for Advances – The DIP Lender will receive a superpriority claim for the advances made under the DIP Note, which will be paid on the effective date of a plan.

h.      Maturity Date – The Debtors' obligations under the DIP Note will be payable on demand of the DIP Lender, or upon the Maturity Date, which will be 180 days after the Petition Date, unless extended in writing by the DIP Lender.

i.      Events of Default - The list of events of default are set forth in Section 7 of the DIP Note, but include failure to make payments to the DIP Lender as required under the DIP Note, dismissal or conversion of the Cases, appointment of a trustee, allowance of a surcharge against the DIP Lender, failure to obtain confirmation on the schedule required under the DIP Note or confirmation of a plan that is not acceptable to the DIP Lender, and failure to obtain approval of the Transaction Termination Fee.

193.    The Debtors further seek permission from this Court to use cash collateral, as set forth in the Budget, to fund ongoing operations.

194.    The Debtors require immediate access to the cash collateral to, among other things, fund any interim obligations while DIP financing is forthcoming.

195.    Accordingly, the Debtors request that the Court authorize the Debtors to immediately use the cash collateral in the amounts set forth in the Budget, pending a final hearing. At the final hearing, the Debtors request that the relief requested be granted on a permanent basis, at which time the Debtors hope to have resolved any disputes regarding ownership and values of pre-petition accounts receivable and amounts owed to Third Coast.

196.    The DIP Lender is willing to provide bridge financing to the Debtors to enable the Debtors to operate during these bankruptcy Cases, but only on the terms described in the Motion and more fully in the DIP Note. Based on management's efforts, they have concluded that the DIP Note is the only means of obtaining the amount of capital necessary to operate the Debtors' business while the Debtors seek confirmation and consummation of the plan.

197.    Under the circumstances, the Debtors have concluded that DIP Lender is the only party willing to finance the Debtors' operations in the amounts necessary to complete their reorganization. On these facts, I believe the relief requested is warranted.

**M.    Motion for Authorization to Enter Into Transaction Outside the Ordinary Course of Business by Transferring Employment of Employees From Debtor Tahoe Joe's, Inc. to Non-Debtor Affiliate FMP Ovation Payroll LLC**

198.    By this Motion, the Debtors seek an order authorizing, but not directing, the Debtors to Transfer Employment of Employees of Debtor Tahoe Joe's, Inc. ("Tahoe Joe's") to FMP Ovation.

199.    Debtors Buffets, LLC, Hometown Buffet, Inc., OCB Purchasing Company, LLC, OCB Purchasing, Co., Ryan's Restaurant Group, LLC, and Fire Mountain Restaurants, LLC (all Debtors other than Tahoe Joe's) do not have any employees. FMP-Ovation, a privately held company, employs the employees who perform a broad spectrum of services for the Debtors, including, without limitation, marketing, food and supply procurement, restaurant management,

front of house service, kitchen services, finance and accounting, and information technology services (the "Employees").

200.    In the period prior to the Petition Date, there were approximately 15,325 salaried and hourly FMP-Ovation employees working at the non-Tahoe Joe's restaurants. As a result of the Debtors closing 92 stores immediately preceding the bankruptcy filing, the Debtors estimate that postpetition approximately 9,000 salaried and hourly employees will work at the non-Tahoe Joe's restaurants.

201.    In connection with the salaries and wages paid to Employees, FMP-Ovation also handles (as required by law) withholding from their Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare and remit same to the applicable taxing authorities. FMP-Ovation also handles deduction of certain amounts from Employees' paychecks, including, without limitation, garnishments, child support and service charges, and similar deductions. The non-Tahoe Joe's Debtors, prior to each pay day, advance FMP-Ovation the funds necessary to pay the Employees.

202.    The Debtors have structured the employment of the restaurant employees this way to efficiently reduce overhead expenditures and take advantage of the cost savings associated with consolidating back office functions with the other non-debtor companies affiliated with FMP and FMP Ovation. By utilizing FMP Ovation, the Debtors eliminate the high cost burden of payroll related costs when compared with use of an outside payroll service, such as Automatic Data Processing, Inc. ("ADP").

203.    Tahoe Joe's, however, has its own employees. In the months leading up to the Chapter 11 filing, the Debtors were in advanced discussions with third parties regarding a potential sale of Tahoe Joe's. To keep Tahoe Joe's "separate" and thus ease a sale of the

enterprise to a third party, the Debtors did not migrate Tahoe Joe's employees to FMP Ovation. Unfortunately, no sale was able to be consummated prior to the Petition Date.

204.    Therefore, in the ordinary course of business, Tahoe Joe's employs its workforce and uses a payroll processor, ADP, to pay payroll. Having duplicative employers and payroll processors is wasteful for the estates and denies Tahoe Joe's the efficiencies that come with consolidation of employees at FMP Ovation. Moving Tahoe Joe's employees over to FMP Ovation will eliminate the high cost burden of the ADP payroll processing fees and allow Buffets to reject the ADP contract. The Tahoe Joe's payroll will be efficiently managed and processed by FMP Ovation at a much lower cost.

205.    By this motion, the Debtors request authorization, but not direction, to transfer employment of the employees of Tahoe Joe's to non-debtor affiliate FMP Ovation, consistent with past and current employment practices of the Debtors' other entities and restaurants.

206.    Maintaining a centralized employment structure at the FMP Ovation level for all of the Debtors is critical to the Debtors' restructuring efforts and will allow Tahoe Joe's to benefit from the efficiencies of centralize "back office" employment and wage functions. Moving the employees to FMP Ovation will also benefit the creditors of the Tahoe Joe's estate as G&A costs will be optimized and reduced. Using FMP Ovation will eliminate the high cost burden of the ADP payroll processing fees and allow Buffets to reject the ADP contract. Also, the employee's payroll will be efficiently managed and processed by FMP Ovation at a much lower cost. Thus, the Debtors believe this "use" of estate property outside the ordinary course of business is permitted by Bankruptcy Code section 363(b) as maximizing the assets in the Debtors' estates by reducing costs.

207.    For these reasons, the Debtors submit the relief requested is necessary to avoid immediate and irreparable harm to the Debtors.

**IV.    Conclusion**

208.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

_/s/ Peter Dobavand_
Peter Donbavand
Vice President for Business Development,
Buffets, LLC, Hometown Buffet, Inc., OCB
Restaurant Company, LLC, OCB Purchasing, Co.,
Ryan's Restaurant Group, LLC, Fire Mountain
Restaurants, LLC and Tahoe Joe's, Inc.