

**Signed February 08, 2019.**

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BUFFETS, LLC, *et al.*, | § | CASE NO. 16-50557-RBK |
| | § | |
| | § | |
| DEBTORS | § | CHAPTER 11 |

## OPINION

Buffets, LLC, and its affiliates* ("Debtors" or, post-confirmation, "Reorganized Debtors") filed voluntary chapter 11 petitions on March 7, 2016. On April 27, 2017, the Debtors confirmed a plan and were substantively consolidated. The plan and confirmation order provide for payment of quarterly fees to the United States trustee (UST). In October 2017, Congress amended Title 28, section 1930, to provide for an 833 percent increase in the maximum post-confirmation quarterly fees payable by certain chapter 11 debtors with disbursements that equal or exceed $1 million when the UST System Fund balance is less than $200 million. 28 U.S.C. § 1930(a)(6)(B) (2018). The UST System Fund balance currently is less than $200 million, and

---

* THE DEBTORS ARE BUFFETS, LLC; HOMETOWN BUFFET, INC.; OCB RESTAURANT COMPANY, LLC; OCB PURCHASING CO.; RYAN'S RESTAURANT GROUP, LLC; FIRE MOUNTAIN RESTAURANTS, LLC; AND TAHOE JOE'S, INC. THE CASES WERE JOINTLY ADMINISTERED.

the Reorganized Debtors' 2018 disbursements exceed $1 million in every quarter. *See* U. S. DEP'T OF JUSTICE, EXEC. OFFICE OF U.S. TRUSTEES, CHAPTER 11 QUARTERLY FEES, https://www.justice.gov/ust/chapter-11-quarterly-fees.

The principals of the Reorganized Debtors were shocked by the quarterly fee increase. The Reorganized Debtors filed a motion requesting an order establishing the quarterly-fee liability in the amount of $4,875 and determining the word "disbursements" in § 1930(a)(6) is limited to funds disbursed as priority and administrative expense claims, claims of creditors, and interests of equity security holders pursuant to the plan.

In response, the UST filed an objection to the motion. The UST argued that the Reorganized Debtors' interpretation of the term "disbursements" contravenes the word's plain meaning and relevant case law. The UST asked the Court to deny the Reorganized Debtors' motion and set liability for the quarterly fees at $250,000. The Court held a hearing and heard argument from the Reorganized Debtors and the UST. After the hearing, but before the ruling, the UST filed a supplemental brief in support of the objection. The Reorganized Debtors filed a supplemental brief, arguing that the amendment amounts to an unconstitutional violation of the Due Process Clause.

The Court later made findings of fact and conclusions of law, which were stated on the record pursuant to FED. R. BANKR. P. 7052 and 9014, and rendered an order denying the Reorganized Debtors' motion. The Court held that the quarterly fees should be calculated based upon all disbursements made during the quarter. The Reorganized Debtors filed a motion to reconsider the order in light of constitutional violations and a recent opinion from the Western District of Wisconsin, *In re Cranberry Growers Coop.*, 592 B.R. 325 (Bankr. W.D. Wis. 2018) (direct appeal filed).

On October 18, 2018, this Court issued a Notice and Certification of Constitutional Questions under 28 U.S.C. § 2403 and FED. R. CIV. P. 5.1. On November 7, 2018, this Court entered an Order Granting Request to File Brief in Response to Constitutional Challenges.

On November 9, 2018, the UST filed "The United States Trustee's Motion to Vacate the Court's November 7, 2018 Order or in the Alternative, to Adjust the Briefing Schedule so the Government can Meaningfully Address the Debtors' Attempt to Invalidate a Federal Statute." On November 16, 2018, the Court entered an order granting the motion, in part, setting forth a briefing schedule, and identifying issues to be addressed in the parties' briefs.

On December 7, 2018, the Reorganized Debtors filed "Reorganized Debtors' Memorandum of Law in Support of its Motion to Determine Extent of Liability for Post-Confirmation Quarterly Fees Payable to United States Trustee Pursuant to 28 U.S.C. § 1930(a)(6)." The Debtors argued that the statute violates the Uniformity Clause of Article I of the United States Constitution, and the retroactive effect of the amendment on the Reorganized Debtors violates the constitutional protections of due process and prohibition against takings. Further, the Debtors argued that UST fees are a form of user-fee rather than a tax; therefore, the user-fees are grossly disproportionate to the services that the UST provides to the Debtors. The UST filed its response brief on December 21, 2018.

The Court finds that it has jurisdiction to render a final order in this core proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This opinion constitutes the findings of fact and conclusions of law of the Court pursuant to FED. R. BANKR. P. 7052 and 9014.

The issue before the Court is whether 28 U.S.C. § 1930(a)(6)(B) requires the Reorganized Debtors to pay $250,000 in quarterly fees to the United States trustee for each quarter of 2018. The amendment codified in § 1930(a)(6)(B) provides the following:

> During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

## BACKGROUND

A discussion of the events that led to this statutory provision and its amendment is instructive. In 1986, after the completion of a pilot program, Congress established the UST program. The Attorney General was directed to appoint USTs in all districts, including Alabama and North Carolina; however, Congress excluded Alabama and North Carolina from the program. Instead, Alabama and North Carolina utilize the Bankruptcy Administrator (BA) program, which reports to the Administrative Office of the United States Courts. The BA program is part of the judicial branch while the UST program is part of the executive branch. Congress mandated that the UST program be implemented in Alabama and North Carolina either upon the districts electing to join or by October 1, 1992, later extended to October 1, 2002. *See* P.S.L. No. 101-650, Dec. 11, 1990, title III, § 317(a) & (c), 104 Stat. 5115, 5116. Despite Congress's original intent to implement the UST program nationwide, it has never been implemented in Alabama and North Carolina. The six districts in Alabama and North Carolina continue to operate under the BA program.

The UST and BA programs are a necessary component of the chapter 11 system in that they provide post-petition supervision of chapter 11 cases in their respective districts. In 1992,

the General Accounting Office (GAO) filed a report recommending the UST program absorb the BA program because there was no need to continue two separate programs. GAO Report No. GAO/GGD-92-133, "Bankruptcy Administration: Justification Lacking for Continuing Two Parallel Programs" (Sept. 28, 1992). "Accordingly, because of the advantages in oversight and funding provided by the UST program and to make bankruptcy administration consistent across the country, we recommend that Congress incorporate the BA program into the UST program now rather than in 2002 as currently scheduled under statute." *Id.* at 2. The report indicated that the purpose of the UST System Fund was to create a self-funding mechanism. Originally, chapter 11 debtors in UST districts paid filing and quarterly fees, but debtors in BA districts were *not* charged quarterly fees. The report indicated that the UST program had a surplus because the fee revenues exceeded program funding by millions of dollars. *Id.* The Bankruptcy Reform Act of 1994 remedied several differences between the two programs, but *it did not apply uniform fee requirements*. *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 103d Cong. (2d Sess.) (Oct. 6, 1994).

## QUARTERLY FEES

Quarterly fees are based on the total amount of disbursements in each quarter. 28 U.S.C. § 1930(a)(6)(A). The term "disbursements" is not defined in the statute, but a majority of courts interpret the term broadly to include all transfers from the estate, including payments made in the ordinary course of business. *See* **In re Danny's Markets, Inc.**, 266 F.3d 523, 526 (6th Cir. 2001) (defining disbursements as "all payments to third parties directly attributable to the existence of the bankruptcy proceeding"); **In re Celebrity Home Entm't, Inc.**, 210 F.3d 995, 998 (9th Cir. 2000) (describing disbursements as an "expansive term that captures 'all payments'"); **In re Jamko, Inc.**, 240 F.3d 1312, 1315–16 (11th Cir. 2001) (holding post-confirmation quarterly fees

include all post-confirmation disbursements); ***In re Pars Leasing, Inc.***, 217 B.R. 218 (W.D. Tex. 1997) (holding disbursements include not only the debtor-in-possession's cash disbursements, but also payments made by third parties for the benefit of the debtor-in-possession); ***In re R&K Fabricating, Inc.***, 2013 WL 5493161, at *3–4 (Bankr. S.D. Tex. Sept. 30, 2013) (holding disbursements include both payments under a plan and "all other amounts paid out by a reorganized debtor"). Certainly, this issue could be resolved if Congress amended the statute with a definition of the term "disbursements."

On September 21, 2018, Judge Catherine J. Furay in *In re Cranberry Growers Coop.* excluded repayments on a revolving line of credit from disbursements because the debtor was contractually obligated to use it to make ordinary course operating payments. ***In re Cranberry Growers Coop.***, 592 B.R. 325 (Bankr. W.D. Wis. 2018). The Reorganized Debtors asked this Court to follow Judge Furay's opinion and narrowly interpret disbursements to only include payments made to creditors of the bankruptcy estate. This interpretation would result in the Reorganized Debtors owing $4,875.00 in fees payable to the UST's office for each quarter of 2018.

After careful examination, this Court agrees with Judge Furay that the new UST fees are excessive and certain situations may require a limitation on what constitutes a disbursement, but a narrow interpretation of disbursements that applies in the case of a revolving line of credit does not apply in this case. This Court reaffirms its original ruling that the term "disbursements" includes all payments made by the Reorganized Debtors. A broad interpretation of disbursements, however, does not subject the Reorganized Debtors' 2018 disbursements to the increased quarterly fee requirement of § 1930(a)(6)(B). As applied to the Reorganized Debtors, the amendment is invalid for the reasons set forth below.

### *1. The amendment to § 1930(a)(6) created non-uniform bankruptcy law.*

In *St. Angelo v. Victoria Farms, Inc.*, the Ninth Circuit struck down the statutory amendment that extended the BA program, holding that it violated the Uniformity Clause. *See* **St. Angelo v. Victoria Farms, Inc.**, 38 F.3d 1525, 1533, 1535 (9th Cir. 1994). The Uniformity Clause of the Constitution states "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. CONST. art. I § 8, cl. 1. The Ninth Circuit held that the extension of the existence of a BA program in Alabama and North Carolina and a UST program in the remaining states was unconstitutionally non-uniform because the fee system was not uniform. *St. Angelo*, 38 F.3d at 1535.

While state laws may cause dissimilarities in the effects of bankruptcy laws as applied, with regard to the BA program, "[i]t is federal law, rather than state law, that causes creditors and debtors to be treated differently in North Carolina and Alabama." *Id.* at 1531. Although exceptions exist to the uniformity requirement to deal with geographically isolated problems, such exceptions do not apply to the inequality of fees in the BA program.

Since the *St. Angelo* decision, the Federal Courts Improvement Act of 2000 was signed into law, and 28 U.S.C. § 1930 was amended to allow the imposition of fees in BA districts. 28 U.S.C. § 1930(a)(7). The Judicial Conference of the United States ("JCUS") approved the Bankruptcy Committee's recommendation to impose quarterly fees "in the amounts specified" in § 1930. *See* JCUS–SEP/OCT 01, pp. 45–46. The Bankruptcy Judgeship Act of 2017 revised subsection § 1930(a)(6) to increase the UST quarterly fees by 833 percent, but this increase did *not* immediately apply to the BA districts. The BA districts petitioned the Committee to apply

the amendment to all districts, the Committee agreed, and the JCUS approved. The increase began applying to BA districts in October 2018, the first quarter of the new fiscal year, nine months after the effective date in UST districts. *See* JCUS-SEP/18, pp. 11–12.

The JCUS's decision to apply the fees to BA districts remedies the amendment's violation of the Uniformity Clause for future cases, but not in this case. Like the lack of uniformity that originally existed between the two programs, the gap in time between the imposition of the quarterly fees in UST districts and BA districts is problematic. "If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply." ***Marbury v. Madison***, 5 U.S. 137, 178 (1803).

The Bankruptcy Judgeship Act of 2017 violated the Constitution when it increased quarterly fees only in the UST program. "Under any standard of review, when Congress provides no justification for enacting a non-uniform law, its decision can only be considered to be irrational and arbitrary." ***St. Angelo***, 38 F.3d at 1532. While the quarterly fees now apply in BA districts from October 1, 2018, forward, the increased fees ostensibly owed by the Reorganized Debtors during the first three quarters of 2018 violate the Uniformity Clause. Therefore, the Reorganized Debtors are not required to pay the $250,000 in fees for the first three quarters of 2018, but rather the uniform quarterly fee of $30,000.

### 2. *The § 1930(a)(6) amendment should not be applied retroactively.*

In addition to the statute's violation of the Uniformity Clause, it is also being retroactively applied to the Reorganized Debtors. There is a statutory presumption against retroactively applying statutes. ***Landgraf v. USI Film Prods.***, 511 U.S. 244, 286 (1994). In *Landgraf*, The Supreme Court set out a detailed analysis of the antiretroactivity canon. *Id.* "The

presumption against statutory retroactivity is founded upon sound considerations of general policy and practice, and accords with long held and widely shared expectations about the usual operation of legislation." *Id.* Additionally, the importance of the presumption against retroactivity is prevalent in the Ex Post Facto Clause, the Obligation of Contracts Clause, the Fifth Amendment Takings Clause, the prohibition of Bills of Attainder, and the Due Process Clause. *Id.* at 266.

To determine if a statute applies retroactively, "the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280. If Congress did so, the inquiry ends. If, however, there is no express reach, the court should apply the rules of construction to determine the reach intended by Congress in the statute. **Lindh v. Murphy**, 521 U.S. 320, 323–26 (1997). If the court cannot determine the statute's reach, then it "must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when [it] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." **Landgraf**, 511 U.S. at 280. If the statute is retroactive, "then it does not govern absent clear congressional intent favoring such a result." *Id.*

In *Landgraf*, the Court considered the Congressional intent behind the Civil Rights Act of 1991, which amended Title VII of the Civil Rights Act of 1964. *Id.* at 251. The petitioner argued that Congress expressed an intent to apply the statute retroactively by including the phrase "[e]xcept as otherwise specifically provided." *Id.* at 257. The Court rejected this argument, reasoning that if Congress intended retroactivity, it would have used the same or similar retroactive language from the proposed 1990 Title VII bill instructing that the amendment "shall

apply to all proceedings pending on or commenced after the date of enactment of this Act." *Id.* at 260 (citing S. 2104, 101st Cong.,1st Sess. § 15(a)(4) (1990)).

Like the Title VII amendment, Congress did not expressly prescribe the reach of § 1930(a)(6)(B). The text of the statute begins with "[d]uring each of fiscal years 2018 through 2022," but this does not indicate a clear intent by Congress to *retroactively* apply the fees to pending cases. 28 U.S.C. § 1930(a)(6)(B). "A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." **Landgraf**, 511 U.S. at 257. Additionally, the legislative history to § 1930 provides little or no guidance on the matter. *See* H.R. Rep. No. 764, 99th Cong., 2d Sess. 22, *reprinted in* 1986 U.S.C.C.A.N. 5227, 5234–35. In proposing the amendment, the Judiciary Committee Report briefly explained that the UST program is funded by fees collected in bankruptcy cases. In the past, there was a surplus in the fund, but a decline in nationwide filings has decreased the amount of funds available. *See id.*

Nothing in the statute or legislative history indicates that Congress intended the amendment to apply retroactively. While the increase applies only to disbursements made on or after January 1, 2018, it does not specify its application to cases pending. The new UST fee of $250,000 per quarter should not be applied to pending cases with a confirmed plan when the statute became effective on October 26, 2017, and the fees became effective in the first quarter of 2018. "The *extent* of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." **Landgraf**, 511 U.S. at 283–84 (emphasis in original). Absent clear congressional intent, the court is not to read "a statute substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment." *Id.* at 284.

The amendment imposes new duties and liabilities on the Reorganized Debtors with respect to transactions already completed. This increase in financial liability negatively impacts the Reorganized Debtors. The plan is well underway, and in this case, like many chapter 11 reorganizations, there are numerous unforeseen administrative expenses, which the Reorganized Debtors must pay, in addition to the day-to-day costs of running over 100 restaurants located all over the United States. An increase in UST fees to $250,000 per quarter ($1 million per year) requires the Debtors to pay 833 percent more in UST fees than were required at the time of filing the case or confirmation of a plan. The amendment to § 1930(a)(6) would allow the UST to divert funds from the Reorganized Debtors' already lean budget to their extreme detriment. If the amendment applied to this case, the priority claimants would be at risk of non-payment and the plan's feasibility would be compromised. Section 1930(a)(6)(B) cannot be applied retroactively in this case; therefore, the quarterly fee increase shall not be applied in this chapter 11 case.

The amendment's possible retroactive application also violates the Due Process Clause. The Due Process Clause provides that "No person shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend V. The Supreme Court has established that "[t]he Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." *Landgraf*, 511 U.S. at 266 (citing ***Usery v. Turner Elkhorn Mining Co.***, 428 U.S. 1, 17 (1976)). Applying the fees retroactively in this case did not provide the Reorganized Debtors with sufficient notice of the increased fees prior to filing chapter 11 or confirmation of a plan.

Section 1141 of the Bankruptcy Code describes the effect of confirmation of a plan. "[T]he important effect of a confirmed Chapter 11 plan is the creation of a contract which

creates *vested substantive property rights* and that is *binding* on the debtor, on any entity issuing securities under the plan, on any entity acquiring property under the plan, and on any prepetition creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of any of these parties is impaired under the plan and whether or not any of these parties has accepted the plan." ***In re Burk Dev. Co.***, 205 B.R. 778, 796–97 (Bankr. M.D. La. 1997) (citing ***Holywell Corp v. Smith***, 503 U.S. 47, 56–59 (1992); ***Eubanks, M.D. v. FDIC***, 977 F.2d 166 (5th Cir. 1992); ***Bank of Louisiana v. Pavlovich (In re Pavlovich)***, 952 F.2d 114 (5th Cir. 1992)) (emphasis in original).

The UST argues that the parties were properly notified by a letter sent out in December 2017. At the time of such notice, the Reorganized Debtors had already confirmed a plan and distributed millions of dollars. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." ***Landgraf***, 511 U.S. at 265.

With the knowledge of the increased fees, future debtors may select pre-packaged plans or choose to restructure debts outside of bankruptcy to avoid the quarterly fees. The Reorganized Debtors in this case had no such opportunity. The Debtors' post-confirmation reports indicate a total of $65,274,569.74 in disbursements for the first quarter of 2018; $67,303,248.20 for the second quarter; and, $62,019,084.00 for the third quarter. Under the old statute, this would require quarterly-fee payments of $30,000 per quarter. The Reorganized Debtors are required to make quarterly-fee payments of $30,000 per quarter for the first three quarters of calendar year 2018, in adherence with the old statute in order to avoid constitutional violations and retroactive application of the statute.

## CONCLUSION

After careful consideration of § 1930(a)(6)(B), this Court holds the amendment unconstitutional as applied to this case due to its lack of uniformity for the first three quarters of 2018. The amendment also cannot be retroactively applied to the Reorganized Debtors for any relevant year. Accordingly, the Reorganized Debtors' motion will be granted. A separate order will be entered.

# # #